## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Lucretia Perry,                                   Case No. 13-cv-1185 (JNE/TNL)

                    Plaintiff,

v.                                                          **REPORT &**
                                                   **RECOMMENDATION**

Carolyn W. Colvin,
Acting Commissioner of Social Security,

                    Defendant.

---

Laura S. Melnick, Southern Minnesota Regional Legal Services, Inc., 55 East Fifth
Street, Suite 400, St. Paul, MN 55101 (for Plaintiff); and

Ann M. Bildtsen and Gregory Brooker (on brief), United States Attorney's Office, 300
South Fourth Street, Suite 600, Minneapolis, MN 55415 (for Defendant).

---

## I. INTRODUCTION

Plaintiff Lucretia Perry brings the present case, contesting Defendant
Commissioner of Social Security's denial of her application for supplemental security
income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1382. This
matter is before the undersigned United States Magistrate Judge on cross motions for
summary judgment, Plaintiff's Motion for Summary Judgment (Docket No. 9) and
Defendant's Motion for Summary Judgment (Docket No. 15). These motions have been
referred to the undersigned for a report and recommendation to the district court, the
Honorable Joan N. Ericksen, District Judge for the United States District Court for the
District of Minnesota, under 28 U.S.C. § 636 and Local Rule 72.2(b).

Based upon the record, memoranda, and the proceedings herein, **IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Summary Judgment (Docket No. 9) be **DENIED** and Defendant's Motion for Summary Judgment (Docket No. 15) be **GRANTED**.

## II. PROCEDURAL HISTORY

Plaintiff applied for SSI in July 2009, asserting that she has been disabled due to dysthymic disorder since October 1, 2008.[1]  (Tr. 10, 74, 128, 140.)  Plaintiff also reported that she was disabled due to depression, generalized anxiety disorder with social phobia, and post-traumatic stress disorder ("PTSD").  (Tr. 79.)  Plaintiff's application was denied initially on February 18, 2010, and again upon reconsideration on September 30, 2010.  (Tr. 74-77, 80-88.)  Plaintiff appealed the reconsideration determination by requesting a hearing before an administrative law judge ("ALJ").  (Tr. 67-70; *see also* Tr. 92-93.)

The ALJ held a hearing on February 16, 2012.  (Tr. 10; *see also* Tr. 104, 110.)  After receiving an unfavorable decision from the ALJ, Plaintiff requested review from the Appeals Council, which denied her request for review.  (Tr. 1-22.)  Plaintiff then filed the instant action, challenging the ALJ's decision.  (Compl., ECF No. 1.)  Plaintiff moved for summary judgment on September 5, 2013 (ECF No. 9), and the Commissioner filed a cross motion for summary judgment on November 20, 2013 (ECF No. 15).  This matter is now fully briefed and ready for a determination on the papers.

---

[1] Dysthymic disorder, or dysthymia, "is a chronic type of depression in which a person's moods are regularly low. However, systems are not as severe as with major depression." *Dysthmia*, PubMed Health, Nat'l Ctr. for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001916/ (last visited July 1, 2014).  The ALJ concluded that Plaintiff does not have any severe physical impairments.  (Tr. 13.)  Plaintiff does not challenge the ALJ's determination regarding the absence of severe physical impairments.

### III. RELEVANT MEDICAL HISTORY

Plaintiff challenges only the ALJ's findings and decision relating to her mental impairments. Accordingly, the Court focuses on the records relevant to these impairments.

#### A. 2007

On November 7, 2007, Plaintiff was seen at the Bethesda Clinic by Samuel Inkumsah, M.D., for a complaint unrelated to her mental health. (Tr. 389, 390.) As related to the issues present in this case, Dr. Inkumsah noted that Plaintiff had chronic PTSD, mild recurrent major depression, and obsessive compulsive disorder. (Tr. 389.) Plaintiff was in "no distress, comfortable, [and] pleasant" and had an "appropriate mood." (Tr. 390.) Dr. Inkumsah made the same notations with regards to Plaintiff's condition when he saw her both in early and late December. (Tr. 385, 387.) At the late December appointment, Dr. Inkumsah additionally noted that Plaintiff's depression "is mild and currently stable." (Tr. 385.) Dr. Inkumsah noted that Plaintiff will "follow[] up with her counselor" and "[o]verall, [Plaintiff] is a very pleasant lady and seems to be doing pretty well at this point in time." (Tr. 386.)

#### B. 2008

Dr. Inkumsah saw Plaintiff twice in January 2008. Each time, she appeared to be in no distress and had an appropriate mood. (Tr. 380, 382, 383, 384.)

On February 12, Plaintiff saw Dr. Inkumsah "due to an encounter with police that has left her shaking." (Tr. 378.) Plaintiff reported that "her 18[-]year[-]old son had been involved with possible illegal activities that resulted in the police breaking into her house

recently and searching the house for any kind of illegal material." (Tr. 378.) Dr. Inkumsah noted that Plaintiff "finds herself [waking up in the middle of the night,] getting up[,] and walking around the house to make sure everything is locked up." (Tr. 378.) This incident appeared to have aggravated Plaintiff's PTSD already present from an encounter with police several years ago. (Tr. 378.) Dr. Inkumsah noted that Plaintiff had been prescribed Paxil[2], but was not currently taking it. (Tr. 378.) Plaintiff was in "no acute distress" and her mood seemed "appropriate . . . considering the circumstances." (Tr. 379.) Dr. Inkumsah diagnosed Plaintiff with "[PTSD], acute and chronic" and advised Plaintiff to continue taking her Paxil prescription. (Tr. 379.) Dr. Inkumsah also prescribed "Ambien[3] for the next seven days since [Plaintiff] was also complaining of insomnia." (Tr. 379.)

Plaintiff saw Dr. Inkumsah once in March, twice in June, and once in July for conditions unrelated to her mental health. (Tr. 376, 374, 372, 370.) During these visits, Plaintiff appeared "comfortable," "pleasant," and in "no distress" and had an "appropriate mood." (Tr. 377, 374, 375, 372, 373, 370, 371.)

Plaintiff saw Dr. Inkumsah again on August 12 for conditions unrelated to her mental health. (Tr. 368.) Plaintiff also reported, however, that she was having trouble falling asleep and medication sometimes helps. (Tr. 368.) Plaintiff mentioned that she was "working with the Y to get a membership very soon." (Tr. 368.) Dr. Inkumsah

---

[2] Paxil is a brand name for paroxetine, which "is used to treat depression, obsessive-compulsive disorder (OCD), panic disorder, generalized anxiety disorder (GAD), social anxiety disorder (also known as social phobia), premenstrual dysphoric disorder (PMDD), and [PTSD]." *Paroxetine (By mouth) (Paxil)*, PubMed Health, Nat'l Ctr. for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011606/ (last visited July 21, 2014).
[3] Ambien is a brand name for zolpidem, a drug for treating insomnia. *Zolpidem (By mouth) (Ambien)*, PubMed Health, Nat'l Ctr. for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0000157/ (last visited July 21, 2014).

"discussed good sleeping habits including not having the TV or radio on and also exercising." (Tr. 369.) Plaintiff was "in no distress," "comfortable," "pleasant," and had an "appropriate mood." (Tr. 369.)

In October 2008, Plaintiff underwent a psychological evaluation by Ronald L. Hoschouer, Ph.D. (Tr. 282, 289.) When asked by Dr. Hoschouer "if she is currently disabled and unable to work[, Plaintiff] respond[ed], 'No, I can work.'" (Tr. 282.) Plaintiff described "her disability" as depression, anxiety, and obsessive compulsive disorder. (Tr. 282.) Plaintiff stated that these conditions make it so that she "[d]o[es not] like to be around people, [she] like[s] to be alone a lot, can[not] take orders from people, (can[not] stand) someone bossing [her] around . . . ." (Tr. 282.)

When asked about her interests, Plaintiff answered that "she likes to swim and read." (Tr. 282.) Plaintiff described her typical day to Dr. Hoschouer as follows:

> [S]he arises between 5:30 a.m. and 6:00 a.m. After arising, she will do hygiene, get dressed, get the kids up from bed, and clean most of the day, or go to doctor appointments and physical therapy for her arms and back. She states that she will eat a simple breakfast and lunch that she prepares. She starts making dinner around noon. She will read most of the day and wash clothes. The kids come home around 2:45 and after they arrive, she will talk with them about their day, make sure the [seven]-year-old reads, and the rest of the children do their homework. They will then get their school materials ready for school the next day. The family eats dinner between 6 and 7 p.m. She says that she makes sure all the kids get their bath and then they watch TV until 9-9:30 p.m., when it's bedtime for everyone. [Plaintiff] and the teen children shop for food and the teenage children shop for the clothing.

(Tr. 283.)

At the time of Dr. Hoschouer's evaluation, Plaintiff had been "recently evicted from her apartment" and was living with "the children's grand[parents]." (Tr. 283.) Of Plaintiff's seven children, five of them were "living with their older sister." (Tr. 283.) Plaintiff reported getting along well with her family. (Tr. 283.) Plaintiff denied having any friends or interacting with her neighbors. (Tr. 283.) When she was working, Plaintiff did not socialize with her coworkers and "stayed to [her]self." (Tr. 283.)

Dr. Hoschouer noted that Plaintiff was "adequately groomed[;] . . . appear[ed] relaxed, pleasant, and cooperative[;] . . . [was] able to maintain intermittent eye contact[; and was] able to communicate adequately." (Tr. 283.) Plaintiff "g[ave] relevant and coherent information." (Tr. 283.) As for Plaintiff's thought content, Plaintiff endorsed symptoms of cognitive dysfunction, including "difficulty with attention/concentration, distractibility, impaired memory, impaired cognitive functioning, poor judgment, and poor decision making." (Tr. 283.) Plaintiff reported "a history of disorientation" and described symptoms of "thinking disturbance," such as hallucinations, "false beliefs of persecution, inappropriate jealousy, excessive possessiveness, defensiveness, suspiciousness, distrust, and paranoid thinking." (Tr. 283.)

As for Plaintiff's affect and mood, Plaintiff "report[ed] that she has been depressed since childhood" and "is depressed 'every day.'" (Tr. 283.) Within the past month, Plaintiff reported experiencing a

> depressed or lowered mood, sadness, boredom, crying spells, easily teary-eyed, grief about the loss of loved ones (two children), despair or despondency, hopelessness, helplessness, passive suicidal thoughts, low self-esteem, negative self-concept, negative personal identity, feelings of inadequacy,

6

> feelings of worthlessness, guilt, shame, decreased interest in daily activities, loss of pleasure in activities, loss of motivation and drive, apathy, decreased energy or tiredness, fatigue and exhaustion, sleep difficulty . . . , poor concentration, indecisiveness, psychomotor agitation, and psychomotor retardation.

(Tr. 284.)   Plaintiff also "describe[d] symptoms of mood disturbance," including "moodiness, irritability, . . . emotional instability, . . . energized behavior, decreased need for sleep, psychomotor agitation, restlessness, high-strung behavior, inflated self-esteem or grandiosity, excessive verbosity, pressured speech, racing thoughts, poor focus and distractibility, excessive but inefficient activities, and impulsive involvement in risky or self-defeating behaviors." (Tr. 284.)

In addition, Plaintiff described symptoms of anxiety, including "social anxiety (uncomfortable around people, crowds, and public places), obsessive thinking ('A child who has recently passed'), compulsive behavior (cleaning, everything straightened up and in order, checking doors and windows) and generalized anxiety and apprehensiveness." (Tr. 284.)   Plaintiff stated that she "excessively worries about 1) bills/money, 2) the kids, 3) her family, 4) her health, and 5) her future." (Tr. 284.) Plaintiff also stated that she experienced "restlessness, concentration difficulty, easy fatigue, muscle tension, and sleep disturbance." (Tr. 284.)   Plaintiff also reported "a history of panic attacks." (Tr. 284.)

Plaintiff told Dr. Hoschouer that "she was physically, sexually, emotionally, and verbally abused as a child and as an adult." (Tr. 284.)   The abuse was perpetrated by her stepfather as a child and by her boyfriend/partner as an adult. (Tr. 284.)   Dr. Hoschouer

7

noted that Plaintiff had the following symptoms associated with "post-traumatic anxiety: distressing recollections of traumas, emotional re-experience of traumas, memory loss associated with traumas, diminished interest/detachment/restricted affect, exaggerated startle reflex,  hypervigilance, irritability or anger outbursts, and avoidance of situations causing memories of the traumatic situations."  (Tr. 284.)

Plaintiff also described "anger and stress management symptoms," which included "excessive anger, difficulty managing anger, easy emotional upset, low stress tolerance, limited stress coping skills, easily frustrated, difficulty dealing constructively with frustration, . . . impulsivity, over-reactions to situational stresses, and difficulty dealing with changes in routines."  (Tr. 284.)  Dr. Hoschouer noted that Plaintiff expresses her anger and stress "in conflict and aggressive behaviors," such as conflicts with others, "oppositional behaviors, defiant behaviors, difficulty dealing with authority figures, blaming others for problems, verbal aggression (swearing), name-calling, physical aggression . . . , and self-abuse (picking at sores or skin)."  (Tr. 284.)  Plaintiff also reported "a history of conflicts with coworkers."  (Tr. 284.)

Dr. Hoschouer noted that Plaintiff "demonstrates adequate reality contact" and "is oriented to person, day, date, and place."  (Tr. 285.)  Plaintiff could name two of the last three presidents of the United States, but had no knowledge of current events as she "do[es not] like the news."  (Tr. 285.)  Plaintiff could not "interpret simple proverbs" and, "[w]hen asked what she would do if she were the first person to see smoke or fire in a crowded movie theater, she respond[ed], 'Yell smoke, fire.'"  (Tr. 285.)

Dr. Hoschouer stated that Plaintiff "describes symptoms that may be related to a personality disorder.   These symptoms include depression, moodiness, anxiety, post-traumatic anxiety, anger and stress, conflict and aggressive behaviors, cognitive dysfunctioning, and thinking disturbance."  (Tr. 285.)

Dr. Hoschouer also performed a series of tests in connection with his assessment of Plaintiff.  Dr. Hoschouer observed that Plaintiff "is able to understand the testing instructions"; "is able to attend adequately and concentrate during the testing"; and "does not become unduly upset when she does not know the answers to the question items."  (Tr. 285.)  Dr. Hoschouer performed the Wechsler Adult Intelligence Scale-III ("WAIS-III")[4] IQ test, where Plaintiff "achieve[d] a Verbal IQ of 65 and a Performance IQ of 70, which yields a Full Scale IQ of 64."  (Tr. 285.)  This score placed Plaintiff "in the extremely low section of the normal distribution of scores" and Plaintiff "would be considered 'extremely low intelligence' as compared with her peers."  (Tr. 285.)  Based on the Wide Range Achievement Test-3 ("WRAT-3")[5], Plaintiff's reading ability was at a sixth-grade level and her arithmetic ability was at a fourth-grade level.  (Tr. 286.)

---

[4]

> The Wechsler Adult Intelligence Scales test (WAIS–III), the standard instrument in the United States for assessing intellectual functioning.  The WAIS–III is scored by adding together the number of points earned on different subtests, and using a mathematical formula to convert this raw score into a scaled score.  The test measures an intelligence range from 45 to 155.  The mean score of the test is 100, which means that a person receiving a score of 100 is considered to have an average level of cognitive functioning.  It is estimated that between 1 and 3 percent of the population has an IQ between 70 and 75 or lower, which is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition.

*Atkins v. Virginia*, 536 U.S. 304, 309 n.5 (2002) (citations omitted).
[5] "The Wide Range Achievement Test measures basic academic skills including word reading, sentence comprehension, spelling and math computation. The results are based on a representative national sample of over 3,000 individuals who were selected according to a national sampling procedure."  *Hooey v. Astrue*, 11-CV-2805

On the Adaptive Behavior Assessment System-II[6], Plaintiff received borderline scores in the areas of communication and self-direction; below average scores in the areas of community use, home living, and health and safety; extremely low scores in the areas of functional academics, leisure, and social; and an average score in the area of self-care. (Tr. 286.) Collectively, these scores placed Plaintiff in the "extremely low range of ability" with respect to general adaptive skills, conceptual skills, and social skills, and "below average range of ability" with respect to practical skills. (Tr. 286-87.)

Based on Plaintiff's low test scores, Dr. Hoschouer concluded that "it appears very likely that [Plaintiff] will not be able to maintain competitive employment." (Tr. 287.) Dr. Hoschouer also observed that Plaintiff's "depression, moodiness, anxiety, post-traumatic anxiety, anger and stress management, conflict and aggressive behaviors, cognitive dysfunctioning [sic], and thinking disturbance" would likely interfere with Plaintiff's ability to pay attention and concentrate, which "in turn would interfere with her ability to maintain competitive employment." (Tr. 287.) Dr. Hoschouer found no evidence of decompensation. (Tr. 287.)

Dr. Hoschouer diagnosed Plaintiff with depression, generalized anxiety disorder with social phobia and obsessive-compulsive features, and PTSD. (Tr. 287.) Dr. Hoschouer concluded that Plaintiff had "[m]ild mental retardation with extremely low general adaptive skills," (Tr. 287), and "serious symptoms, serious impairment in social and occupational functioning," (Tr. 288). Dr. Hoschouer gave Plaintiff a Global

---

(JRT/TNL), 2012 WL 5830402, at *2 n.3 (D. Minn. Oct. 12, 2012) (citation omitted), *adopting report and recommendation*, 2012 WL 5833271 (D. Minn. Nov. 16, 2012).
[6] "[T]he Adaptive Behavior Assessment System, Second Edition (ABAS–II) . . . measures ten different adaptive function areas." *Ortiz v. United States*, 664 F.3d 1151, 1159 (8th Cir. 2011).

Assessment of Functioning ("GAF") score of 40 to 45[7], indicating "[s]erious symptoms, serious impairment in social and occupational functioning."  (Tr. 288.)  Dr. Hoschouer also concluded that Plaintiff "is unable to handle her own funds."  (Tr. 288.)

Dr. Hoschouer opined that Plaintiff "is likely to experience vocational limitations because of her extremely low intelligence and mental health problems.  [Plaintiff] is not likely to be able to engage in competitive employment. . . . Her ability to work with male staff may be affected by her post-traumatic experiences."  (Tr. 288.)

Dr. Hoschouer stated that Plaintiff "should be considered a 'vulnerable adult' because of her extremely low intelligence and mental health problems."  (Tr. 288.)  Dr. Hoschouer stated that Plaintiff "will continue to require at least a moderate degree of external structure, supervision, and support over the long-term" and recommended that Plaintiff "receive individualized skill training for independent living in the community" due to Plaintiff's "functional deficits" in the areas of "management of mental health symptoms, accessing mental health services, vocational functioning, educational

---

[7]

> The Global Assessment of Functioning ("GAF") scale is a rating of overall functioning on a scale of 0 to 100, taking into account psychological, social and occupational functioning. Diagnostic and Statistical Manual of Mental Disorder 34 (American Psychological Association 4th ed. text revision 2000) ("DSM–IV–TR"). Scores of 31–40 indicates some impairment in reality testing or communications or major impairment in several areas, such as work, school, family relations, judgment, thinking or mood. *Id.* Scores of 41–50 indicate serious symptoms or any serious impairment in social, occupational or school functioning. *Id.* Scores of 51–60 indicate moderate symptoms or any moderate difficulty in social, occupational or school functioning. *Id.* Scores of 61–70 indicate some mild symptoms or some difficulty in social, occupation or school functioning but generally functioning pretty well. *Id.* Scores of 71–80 indicate that if symptoms are present, they are transient and expectable reactions to psychosocial stressors. *Id.*

*McDermott v. Astrue*, No. 11-cv-2409 (PJS/AJB), 2012 WL 3202946, *2 n.2 (D. Minn. June 13, 2012), *adopting report and recommendation*, 2012 WL 3156003 (Aug. 3, 2012).

functioning, social/interpersonal functioning, family relationships, medical health, obtain/maintain financial assistance, and obtain/maintain housing." (Tr. 288.)

Dr. Hoschouer recommended that Plaintiff "receive individual psychotherapy and psychiatric medication management" as well as "group therapy with a social/adaptive skills approach." (Tr. 288.) Dr. Hoschouer also recommended that "application be made for county developmental disability services and for [SSI]." (Tr. 288.)

Plaintiff was next seen at the Bethesda Clinic in late December by Stefan Pomrenke, M.D. (Tr. 364.) While Plaintiff's visit was prompted by a complaint unrelated to her mental health, Dr. Pomrenke made the following notes concerning Plaintiff's mental health:

> [Plaintiff] also scored high on PHQ9 ~ 17.[8] [Plaintiff] states she is depressed currently, gained 20 pounds over the past three months. Over the summer she hosted a party at which a male was shot and killed outside of her house. Also the house she was renting was placed into foreclosure in [S]eptember and she has been living with her sister since then with her 5 children eldest is 16 [years old] youngest 7 [years old]. . . . Not currently with a job or seeking a job is being assisted by the state for her children, she does not have any other disability. She states she does not talk to anyone about her problems. She had been in therapy about 1 year ago . . . . She is willing to start therapy again.

---

8

      The Patient Health Questionnaire, PHQ–9, is used to screen, diagnose, monitor, and measure the severity of depression. Scores of 15–19 indicate moderately severe major depression that warrants treatment with an antidepressant or psychotherapy. Scores of 20 and greater indicate severe major depression that warrants treatment with an antidepressant and psychotherapy. The highest possible score is 27, if the individual has endorsed all nine categories of symptoms occurring nearly every day.

*Ramo v. Colvin*, No. 13-cv-1233 (JRT/JJK), 2014 WL 896729, at* 5 n.12 (D. Minn. Mar. 6, 2014) (citations omitted).

(Tr. 364.)   Dr. Pomrenke "referred [Plaintiff] to [DIAMOND[9]] to arrange continuing therapy along with [Paxil] and possible [Paxil] augmentation in the future."   (Tr. 365.)

### C. 2009

On January 2, 2009, Deanna Bass, M.D., of the Bethesda Clinic, reviewed Plaintiff's chart in connection with the DIAMOND program and met with DCC[10] Chris Castro.   (Tr. 363.)   Dr. Bass noted Plaintiff's past diagnoses of PTSD, depression, and obsessive compulsive disorder.   (Tr. 363.)   Dr. Bass recommended "a referral to Chrysalis" for "non-medication intervention," which "DCC will facilitate."   (Tr. 363.) Noting that Plaintiff was experiencing daytime fatigue and difficulty sleeping, Dr. Bass recommended that Plaintiff take Paxil in the evening.   (Tr. 363.)   Dr. Bass also recommended the DCC discuss with Plaintiff whether Paxil "had ever been helpful" to her so that Dr. Bass could make "[a] specific med rec. . . . at that time."   (Tr. 363.)

On January 8, Plaintiff had a follow-up appointment through DIAMOND and was seen by Christina Miller.   (Tr. 361, 362.)   During her appointment, Plaintiff's PHQ-9 score was 16, indicating "[s]evere depression."   (Tr. 361.)   Miller also noted that Plaintiff is in the process of renewing her state identification as "[s]he would eventually like to apply for a job and then the YMCA . . . ."   (Tr. 362.)   Miller noted that Plaintiff's obsessive-compulsive-disorder diagnosis is "unclear" and Plaintiff no longer feels as though cleaning interferes with her life.   (Tr. 362.)

---

[9] DIAMOND stands for "Depression Improvement Across Minnesota, Offering a New Direction" and is a collaborative approach to caring for patients with depression.  *The DIAMOND Program: Treatment for Patients with Depression in Primary Care*, Institute for Clinical Systems Improvement (June 2014), *available at* https://www.icsi.org/health_initiatives/mental_health/diamond_for_depression/background_and_research_articles/.
[10] While the "DCC" acronym is not defined in the record, it appears that the acronym stands for DIAMOND care coordinator.  (*See* Tr. 335.)

Additionally, Miller documented an "episode" Plaintiff had approximately one month before "when she thought the sidewalk was veering off towards a ramp. She followed it and went into the street where there was traffic. Her kids stopped her and asked her what was wrong. After the kids pointed it out, [Plaintiff] realized that the ramp did not exist." (Tr. 362.) Plaintiff was taking her medication at the time, but was also "under a lot of stress" due to the lack of permanent housing. (Tr. 362.)

In a follow-up appointment with DIAMOND approximately one week later, Plaintiff's PHQ-9 score was 12, indicating "[m]oderate depression." (Tr. 359.) Miller expressed concern over the effectiveness of Plaintiff's Paxil prescription as Plaintiff felt there had been "little improvement in the past year." (Tr. 359.) Plaintiff was, however, sleeping better since she began taking the prescription at night. (Tr. 359.) Plaintiff had not been able to renew her identification, but still wanted to do so in order to "obtain a job and go to the YMCA." (Tr. 360.)

Plaintiff also discussed her mother's health. (Tr. 360.) Plaintiff was "tearful" when talking about her mother. (Tr. 360.) Plaintiff talked about "possibly traveling to New Jersey to visit her mother," but Miller noted that finances were a barrier and so they discussed how Plaintiff "can start[] saving and planning for the trip." (Tr. 360.) In addition, Miller noted that Plaintiff's housing status was "resolved." (Tr. 360.) Miller also made notes for Plaintiff's primary care giver, questioning whether a medication was necessary given that there is "[s]ome improvement in PHQ-9 especially in regards to ability to fall asleep at night-otherwise remains about the same. (Tr. 360.)

14

Plaintiff's chart was reviewed by Dr. Bass and Ann Brosnan at the Bethesda Clinic on January 30. (Tr. 358.) They observed a "[d]ownward trend . . . ." in Plaintiff's PHQ-9 scores, with her most recent score of 6 on January 23. (Tr. 358.) They also noted that Plaintiff's "OCD symptoms seem less dominant over the last year and that may be partly due to Paxil," which Plaintiff is tolerating better. (Tr. 358.) They recommended that no changes be made to Plaintiff's medication at this time; Plaintiff continue treatment for at least one year "and then reassess with Dr. Bass"; and Plaintiff continue participating in the DIAMOND program. (Tr. 358.)

Plaintiff was next seen at the Bethesda Clinic on March 3 by Kimberly Bigelow, M.D., for complaints unrelated to her mental health and difficulty sleeping. (Tr. 355.) Plaintiff was described as "comfortable," "pleasant," and in "no distress." (Tr. 355.)

Plaintiff had another DIAMOND appointment with Miller approximately one week later. (Tr. 354, 357.) Plaintiff's PHQ-9 score was now 20, indicating "[s]evere depression." (Tr. 354, 357.) Miller also noted a corresponding mood change for no apparent reason and difficulty falling and staying asleep. (Tr. 354.) Nevertheless, Plaintiff had renewed her identification; her "[h]ousing issues have resolved themselves"; and her stress over her mother "ha[d] improved with some extra services." (Tr. 357.)

During this appointment, Plaintiff also reported "hearing voices" calling her name, approximately twice per day. (Tr. 357.) Plaintiff reported that she previously heard voices "a few years ago," but they stopped and only recently started again within the last two weeks. (Tr. 357.) Plaintiff also reported that she "has been more agitated and prefers to be alone." (Tr. 357.)

15

At Plaintiff's next DIAMOND appointment with Miller approximately one week later, Plaintiff's PHQ-9 score was 19, still indicating "[s]evere depression."  (Tr. 352; *see also* Tr. 351.)  Miller documented concerns of increased difficulty sleeping and psychosis related to the voices.  (Tr. 352, 353, 351.)  Miller stated that this was a "joint visit . . . to determine best plan of care and how to treat potential psychosis," which included Dr. Bass, David Hunter, M.D., and the DCC.  (Tr. 353; *see also* Tr. 351.)   Dr. Bass recommended that Plaintiff take Abilify.[11]  (Tr. 353; *see also* Tr. 351.)

Dr. Bass reviewed Plaintiff's chart on March 18 and noted that Plaintiff's "depression needs more aggressive treatment."  (Tr. 349.)  Dr. Bass stated that "[t]his would probably be a good [point] to get to a psychiatrist—both for diagnostic clarity and long[-]term management."  (Tr. 349.)  Dr. Bass stated that "constant updates" would be needed to make ongoing medication recommendations and observed that the Abilify might improve Plaintiff's depression as well as treat her psychosis.  (Tr. 349.)

Dr. Hunter saw Plaintiff for a follow-up visit related to her depression two days later.  (Tr. 347.)  Dr. Hunter recommended that Plaintiff continue taking Abilify as she was tolerating it well.  (Tr. 347.)  Plaintiff still reported difficulties sleeping and hearing voices "but fel[t] as if the voices are less."  (Tr. 347.)  Plaintiff appeared more relaxed and spontaneous although "she does not feel that she is having a steady improvement."  (Tr. 347.)   In coordination with Dr. Bass, Dr. Hunter increased Plaintiff's Paxil prescription.  (Tr. 347, 348.)

---

[11] Abilify is a brand name for aripiprazole, which "is used to treat nervous, motion, and mental conditions." *Aripiprazole (Abilify)*, PubMed Health, Nat'l Ctr. for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0000157/ (last visited July 21, 2014).

Plaintiff was seen at the Bethesda Clinic by Tajinder Singh, M.D., on March 25 for reasons unrelated to her mental health. (Tr. 344, 346.) Dr. Singh noted a new diagnosis of "Major Depression, Recurrent with Psychotic Features." (Tr. 344.) Dr. Singh observed that Plaintiff was in "no distress, comfortable, [and] pleasant" and had an "appropriate mood." (Tr. 345, 346.)

Plaintiff saw Dr. Bigelow at the Bethesda Clinic for follow-up appointment regarding her depression on March 27. (Tr. 342, 343.) Dr. Bigelow noted that the voices "ha[ve] improved greatly" and Plaintiff was feeling less agitated. (Tr. 342.) Plaintiff still reported "feel[ing] a bit restless at times and still has some difficulty with sleeping." (Tr. 342.) Dr. Bigelow noted "a slight improvement" in Plaintiff's PHQ-9 score, which was now 15. (Tr. 343.) Plaintiff was in "no distress, comfortable, [and] pleasant." (Tr. 342.) Plaintiff reported feeling "a bit better." (Tr. 343.) Dr. Bigelow discussed with Plaintiff "that Paxil takes some time, a couple of more weeks, to take full effect." (Tr. 343.)

At a follow-up appointment in mid-April, Dr. Bigelow noted that Plaintiff's depression is "improving"; Plaintiff's medications were "working quite well"; Plaintiff "is feeling much, much better." (Tr. 340.) Plaintiff had some continuing difficulties with sleep, but attributed them to her teenager slamming the door late at night. (Tr. 340.) Plaintiff was no longer hearing voices and her PHQ-9 score was down to 9. (Tr. 340.) Dr. Bigelow observed that Plaintiff was in "no distress, comfortable, [and] pleasant." (Tr. 340.) Dr. Bigelow continued Plaintiff's depression-related medications. (Tr. 340.)

Plaintiff returned to the Bethesda Clinic at the end of April "complaining of increased irritability, high energy, restlessness, [and] agitation for the past . . . week."

(Tr. 338.)  She was seen by Kene Ogbogu, M.D.  (Tr. 339.)  Plaintiff had stopped taking Abilify and lowered her dose of Paxil when she started experiencing these symptoms. (Tr. 338.)  Since the self-reduction in Paxil, Plaintiff did not feel as "agitated, restless[,] or irritable."  (Tr. 338.)  Abilify made sleeping difficult and Plaintiff did not want to resume taking it.  (Tr. 338; *see also* Tr. 339.)  Plaintiff was also unwilling to resume her prescribed dose of Paxil.  (Tr. 339.)  Dr. Ogbogu counseled Plaintiff on "the importance of medications in management of [Plaintiff's] symptoms," and attempted to put Plaintiff in touch with the Fairview Mental Health Clinic for a psychiatric consultation.  (Tr. 339.)

Plaintiff saw Dr. Ogbogu again the following week, reporting improvements in her irritability and sleep.  (Tr. 336; *see also* Tr. 337.)  Plaintiff stated that she had not been hearing voices and her PHQ-9 score was 9.  (Tr. 336; *see also* Tr. 337.)  During this visit, Plaintiff also told Dr. Ogbogu that "she lost a close family friend about a year ago.  Every week[,] . . . she reflects on her friend's death and is emotional about it. . . . [H]er son was shot 3 y[ea]rs ago but survived.  She tends to worry a lot about her kids."  (Tr. 336.)  Dr. Ogbogu noted that a psychiatric appointment had been scheduled for Plaintiff for May 12 and Plaintiff would continue with the reduced dose of Paxil until this appointment.  (Tr. 337.)  Dr. Ogbogu also recommended that Plaintiff attend psychotherapy and coordinated "with the clinical psychologist [Christine] Danner, [Ph. D.,] who evaluated [Plaintiff] and helped set up a visit with one of the psychologists on May 4."  (Tr. 337.)

Dr. Danner also made notes from the visit.  (Tr. 334.)  Plaintiff told Dr. Danner that "[a] 15[-]year[-]old boy, a friend of her daughter, was shot and killed by another teen while leaving a party at their home.  Her daughter was also with him at the time."  (Tr.

18

334.)  Dr. Danner noted that Plaintiff "has intrusive thoughts of this incident and on-going sadness and guilt about not having preventing it."  (Tr. 334.)  Plaintiff also relayed to Dr. Danner that, approximately three years ago, her teenage son was shot and survived. (Tr. 334.)  Dr. Danner noted that this incident "has contributed to feelings of anxiety and depression in [Plaintiff's] life."  (Tr. 334.)  Dr. Danner observed that Plaintiff "appeared sad and tearful at times . . . when relaying some of the traumatic history" and "endorse[d] intrusive thoughts of death, a trend towards isolating herself secondary to not wanting to talk about what happened, she feels guilt and responsibility for not having prevented the incident and worries that others may judge her as well."  (Tr. 334.)  Dr. Danner set an appointment for Plaintiff "with Jane at the Associated Clinic[] of Psychology . . . [for] May 4."  (Tr. 334-35.)  Dr. Danner also "[p]rovided some psychoeducation regarding the nature of trauma and the potential for post-traumatic stress" and "[d]iscussed how social isolation may be hurtful to [Plaintiff]."  (Tr. 335.)

On May 4, Plaintiff was seen at the Associated Clinic of Psychology by Jane M. Hollis, M.A., L.P.  (Tr. 318-24, 601.)  In her intake form, Plaintiff stated that she was seeking counseling "for the death of my children's friend."  (Tr. 318.)  When asked what she hoped to achieve from counseling, Plaintiff stated "not blame myself" and "to get off my mind every day [and] night."  (Tr. 318.)  Plaintiff reported that she lived in a home with five of her children, ages 7 through 16.  (Tr. 320.)  She had no housing, financial, or legal concerns.  (Tr. 320, 321.)  Plaintiff reported having good relationships with her children, mother, and siblings, and frequently talked with her mother and siblings on the phone.  (Tr. 320.)  Plaintiff's motivation was "[l]ow" and she reported experiencing

major changes within the past year, including "[b]lended family issues" and the "[d]eath of a family member or friend."  (Tr. 321.)  Plaintiff enjoyed walking, running, swimming, attending the YWCA, and reading.  (Tr. 322.)  Plaintiff reported that she had no friends. (Tr. 322.)  Plaintiff also reported that she was sexually abused by her stepfather.  (Tr. 322; *see also* Tr. 303.)  Plaintiff checked "Yes" when asked whether she had any safety concerns for members of her family, but did not describe those concerns.  (Tr. 322.)

Plaintiff was then asked to check which functional concerns she had and to rate the "severity/frequency" of the concern.  (Tr. 323-24.)  Among other things, Plaintiff reported that she was extremely/constantly concerned about social withdrawal, diminished social interaction, isolation, and "[i]nhibitions in social situations."  (Tr. 323.) Plaintiff was mildly/occasionally concerned about arguments, aggression, oppositional behavior, stormy relationships with others, and "[e]xcessive dependency."  (Tr. 323.) Plaintiff also reported that she was extremely/constantly concerned about "[d]ifficulty having fun" and "[l]ack of relaxing and pleasurable activities."  (Tr. 324.)

Hollis noted that Plaintiff presented with symptoms and a history of depression and anxiety; "described symptoms of bipolar disorder"; and "exhibit[ed] signs of PTSD" from the party shooting.  (Tr. 302.)  Hollis wrote that Plaintiff had since moved from the home where the shooting took place, but "still constantly checks doors/windows [and] re-experiences event."  (Tr. 302.)  Hollis also noted that Plaintiff "hears voices calling her name."  (Tr. 302.)  Hollis listed Plaintiff's concerns as depression, lack of motivation, anxiety, difficulty sleeping, isolation, and "intrusive memories."  (Tr. 302.)

Hollis observed that Plaintiff was well-groomed, cooperative, and calm. (Tr. 306.) Plaintiff had an appropriate mood and affect and her thought process was intact. (Tr. 306.) Hollis described Plaintiff's "[r]ecent memory" as "mildly impaired" and both her judgment and insight as minimally impaired. (Tr. 306.)

Evaluating a series of functional impairments, Hollis observed that Plaintiff had a moderate to severe occupational impairment and a mild to moderate educational impairment. (Tr. 306.) Hollis described Plaintiff as mildly impaired in the areas of parenting, obsessive thinking, and "[p]sychosis (current & historical)." (Tr. 307, 308.) Hollis described Plaintiff as being moderately impaired in the areas of "[m]arital/[r]elationships," "[l]ack of pleasure," sleep, appetite, irritability, energy, concentration, anger, "[c]rying spells," and "[h]eart racing." (Tr. 307.) Similarly, Plaintiff was moderately impaired with regards to "[r]ituals (washing, checking, counting)," "[l]abile mood," "[r]acing thoughts," "[m]ania (current & historical)," and paranoia. (Tr. 308.) Hollis determined that Plaintiff was moderately to severely impaired in the areas of "[d]epressed mood," "[f]eelings of guilt/worthlessness," and anxiety. (Tr. 307.) Plaintiff was severely impaired in the area of "[s]ocial [w]ithdrawal." (Tr. 307.) Hollis noted that Plaintiff had past suicidal thoughts, but no current suicidal ideation. (Tr. 308, 309.) Plaintiff also had problems with anger management. (Tr. 309.)

Hollis concluded that Plaintiff met the criteria for bipolar disorder and PTSD. (Tr. 316; *see also* Tr. 311-12, 601.) Hollis noted that Plaintiff had "[e]conomic problems— low income (SSI)" as well. (Tr. 316; *see also* Tr. 601.) Hollis's treatment goals were to stabilize Plaintiff's mood, refer Plaintiff to a psychiatrist for medication to treat her

bipolar disorder and PTSD, and work with Plaintiff to reduce her current stressors.  (Tr.

317.)  Once Plaintiff was stabilized, Hollis would address Plaintiff's PTSD.  (Tr. 317.)

Hollis gave Plaintiff a GAF score of 41.  (Tr. 316; *see also* Tr. 601 ("41-36").)  Finally,

Hollis also gave Plaintiff a psychiatric referral.  (Tr. 316; *see also* Tr. 601.)

Plaintiff saw Hollis again approximately one week later.  (*See* Tr. 301.)   Plaintiff

felt about "the same," but stated that she was supposed to have turned herself in to the

workhouse for five days related to a shoplifting incident.  (Tr. 301.)  Hollis ascribed the

shoplifting incident to a "manic" event associated with Plaintiff's bipolar disorder.  (Tr.

301.)  Hollis noted that Plaintiff was scheduled for a psychiatric appointment in June to

address her medication.  (Tr. 301.)  Hollis also noted that she would see about resuming

Plaintiff's GED coursework.  (Tr. 301.)

Plaintiff was seen at the Bethesda Clinic on May 11 for a complaint unrelated to

her mental health.  (Tr. 332.)  Dokka Williamson, M.D., observed Plaintiff to be in "no

distress, comfortable, [and] pleasant."  (Tr. 332.)

When Plaintiff saw Hollis the following week, Plaintiff reported that she was

"doing fairly well," but experienced a "PTSD flashback" at a barbeque over the weekend.

(Tr. 300.)  Hollis observed that Plaintiff had some PTSD-related anxiety and was "also

anxious due to possible arrest/[Plaintiff] need[s] to turn self in for shoplifting."  (Tr. 300.)

Plaintiff returned to the Bethesda Clinic on May 26 for a follow-up appointment

with Dr. Ogbogu regarding her depression.  (Tr. 329, 331.)  Dr. Ogbogu noted that

Plaintiff still thinks about the party shooting.  (Tr. 329.)  Plaintiff reported that "[t]he kid

that pulled the trigger was also visiting at her house the same day" and "[t]hese

thought[s] are in her mind daily and affect[] her functioning—[s]he avoids mingling with friends for fear of being asked about that event." (Tr. 329.) Dr. Ogbogu noted that Plaintiff's sessions with Hollis had "helped her somewhat." (Tr. 329.) Plaintiff's PHQ-9 score was 15, and Plaintiff endorsed symptoms of a "[d]epressed mood most of the day"; "[m]arkedly diminished interest or pleasure in almost all activities nearly every day"; "insomnia"; "[f]atigue or loss of energy"; and "[i]mpaired concentration, indecisiveness." (Tr. 329, 330.) Plaintiff reported that she was "[w]alking, [r]unning daily." (Tr. 330.) Plaintiff denied any episodes of mania. (Tr. 330.) Dr. Ogbogu increased Plaintiff's Paxil prescription and prescribed Ambien to help Plaintiff sleep. (Tr. 330.)

During Plaintiff's next appointment with Hollis in early June, Hollis noted that Plaintiff is "still having flashback of shooting [and] is afraid of police coming by to pick her up for shoplifting." (Tr. 299.) Hollis provided Plaintiff with a letter discussing her bipolar disorder in an effort to ease Plaintiff's worries. (Tr. 299.) Hollis also worked on some relaxation exercises with Plaintiff. (Tr. 299.)

On June 25, Plaintiff was seen by Kathi Lietzau, M.E.D., M.S., R.N., C.S., a nurse clinical specialist in psychiatry, at Associated Clinic of Psychology. (Tr. 394.) Lietzau noted that Plaintiff was referred by Hollis in order "to establish with a psychiatric medication provider and look at medications for bipolar and PTSD." (Tr. 394.)

Lietzau noted that Plaintiff's Beck II[12] score "is 34, indicating major depression," and a mood questionnaire Plaintiff completed supported symptoms of bipolar disorder.

---

[12] "The Beck Depression Inventory is a twenty-one item self-report rating inventory that measures characteristic attitudes and symptoms of depression." *Jacobson v. Astrue*, No. 12-cv-984 (PJS/JSM), 2013 WL 4586362, at *7 n.9 (D. Minn. Aug. 28, 2013) (citation omitted).

(Tr. 394.)  Plaintiff reported that she began having difficulty sleeping and started feeling depressed following the party shooting.  (Tr. 394.)  "Since that time, [Plaintiff] has struggled with increased depression and PTSD."  (Tr. 394.)  Plaintiff told Lietzau that Ambien helped her fall asleep, but she frequently wakes after midnight and cannot fall back asleep.  (Tr. 394.)  Plaintiff also reported putting on weight "as a result of increased stress from the shooting."  (Tr. 394.)  Plaintiff reported that "she has always been a loner," but has done things recently with her children.  (Tr. 395.)  Plaintiff "joined the YMCA and is hoping [to attend with her children] . . . over the summer."  (Tr. 395.)

Lietzau made the following observations:

> Appearance and grooming are casual.  Behavior is restless at times.  Eye contact is made. . . .  Mood appears depressed; affect is appropriate.  Speech is clear.  [Plaintiff] reports that several weeks ago she did have some auditory hallucinations where she heard voices calling her name.  The Abilify was helpful with that but she just found it too activating.  She does feel that people are watching her.  She has some paranoid thinking.  She does endorse raging thoughts.  Abstract thinking is intact.  She also endorses obsessive thinking.  Compulsive behaviors seem to be mostly germ[-]based cleanliness. . . .  Insight and judgment appear to be intact at today's appointment.  Cognition and memory are intact.  However, [Plaintiff] declined to do serial sevens.

(Tr. 395.)  Lietzau diagnosed Plaintiff with bipolar disorder and PTSD.  (Tr. 395.)  Lietzau assessed Plaintiff as having a GAF score of 45 to 50.  (Tr. 395.)  Lietzau recommended continuing Plaintiff's Paxil, Ambien, and Vistaril prescriptions.  (Tr. 395, 396.)  Lietzau also recommended that Plaintiff begin taking Seroquel.[13]

---

[13] Seroquel is a brand name for quetiapine and "is used to treat nervous, emotional, and mental conditions (eg, schizophrenia).  It may be used alone or together with other medicines . . . to treat symptoms of bipolar disorder . . .

Plaintiff saw Dr. Ogbogu again on June 30, 2009.  (Tr. 327, 328.)  Plaintiff reported that "[s]he is still depressed every day" and felt the same, but was sleeping better.  (Tr. 327.)  Dr. Ogbogu noted that Plaintiff still thinks about the party shooting and these thoughts were recently "heightened" by an incident in which a child was killed. (Tr. 327.)  Dr. Ogbogu observed that Plaintiff "isolates herself and avoid[s] mingling with people"; "does[ not] have much social support"; and "does[ not] have any particular activity that takes her mind off her thoughts."  (Tr. 327.)  Plaintiff was in "no distress, comfortable, [and] pleasant" and her PHQ-9 score was 15.  (Tr. 328.)  Plaintiff's depression was "stable."  (Tr. 328.)  Dr. Ogbogu noted that Plaintiff will follow up with her psychiatrist and continue taking her medications.  (Tr. 328.)  Dr. Ogbogu counseled Plaintiff on the importance of engaging in social and physical activities.  (Tr. 328.)

Plaintiff was seen at Associated Clinic of Psychology on August 10 for medication management.  (Tr. 393.)  It is not clear from the record which provider Plaintiff saw. (*See* Tr. 393.)  Plaintiff was described as "hypomanic."  (Tr. 393.)  Plaintiff's energy level was up and her need for sleep down.  (Tr. 393.)  Plaintiff's appearance, grooming, speech, mood, and affect were all "appropriate."  (Tr. 393.)  Plaintiff did, however, appear fidgety and her insight/judgment, concentration, and memory were just "ok."  (Tr. 393.)  Plaintiff's thought process was "circumstantial."  (Tr. 393.)  Plaintiff was given a trial prescription of Depakote ER.[14]  (Tr. 393.)

---

or mania that is part of bipolar disorder." *Quetiapine (By mouth) (Seroquel)*, PubMed Health, Nat'l Ctr. for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011909/ (last visited July 7, 2014).

[14] Depakote ER is a brand name for valproic acid, which "treats mood disorders" among other things.  *Valproic Acid (By mouth)*, PubMed Health, Nat'l Ctr. for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0012594/ (last visited July 7, 2014).

Plaintiff met with Dr. Ogbogu at the Bethesda Clinic again on August 28.  (Tr. 417.)  Dr. Ogbogu noted that Plaintiff "is still depressed daily" and "is not convinced that the medications are helping maximally.  She also thinks she is forgetful on some occasions, but mainly limited to tasks and not orientation." (Tr. 417.)  Plaintiff still had trouble sleeping, but the Ambien was helping.  (Tr. 417.)  Dr. Ogbogu advised Plaintiff to follow up with her psychiatrist and psychologist and take her medications as prescribed "as a continuous attempt is made to get her on the effective dose."  (Tr. 418.)  Dr. Ogbogu noted that Plaintiff's forgetfulness could be a side effect of the Ambien and told Plaintiff to use reminders and to come back if things started getting worse.  (Tr. 418.)

Plaintiff was seen at Associated Clinic of Psychology on September 3 for medication management.  (Tr. 392.)  Again, it is not clear from the record which provider Plaintiff saw.  (*See* Tr. 392.)  Plaintiff's Beck II score was 22.  (Tr. 392.)  Plaintiff reported sleeping better, but her appetite and energy level were just "ok."  (Tr. 392.)  Plaintiff's appearance, grooming, speech, mood, and affect were "appropriate"; her behavior "relaxed"; and her thought process "logical."  (Tr. 392.)  Plaintiff's insight/judgment, concentration, and memory were still just "ok."  (Tr. 392.)  Plaintiff was "still depressed" and her moods were "still labile," but the Depakote was helping.  (Tr. 392.)  Plaintiff's prescriptions for Paxil and Depakote were increased.  (Tr. 392.)

Plaintiff saw Dr. Ogbogu at the Bethesda Clinic for a physical on September 17.  (Tr. 414.)  Plaintiff experienced "[d]epression daily[] and [had] racing thoughts," but "[n]o hallucinations or hyperactivity."  (Tr. 414.)  Plaintiff had difficulties sleeping and felt tired.  (Tr. 414.)  Plaintiff also reported "[l]ittle interest or pleasure in doing things"

and "[f]eeling down, depressed, or hopeless" for "[s]everal days" in the last two weeks. (Tr. 415.)  Dr. Ogbogu observed that Plaintiff was in "no distress, comfortable, [and] pleasant."   (Tr. 416.)   Dr. Ogbogu assessed Plaintiff as having "[d]epression with psychotic features. . . . [and] advised [Plaintiff] on medication compliance." (Tr. 416.)

Plaintiff saw Lietzau for medication management on November 3.  (Tr. 391.) Lietzau noted Plaintiff's anxiety was "stable"; her depression and mania were "ok"; and her sleep, appetite, and energy levels were all "good."  (Tr. 391.)  Plaintiff's appearance, grooming, speech, mood, and affect were all "appropriate"; her behavior "relaxed"; and her thought process "logical."  (Tr. 391.)  Plaintiff's concentration was "focused" and her memory within normal limits whereas her insight/judgment was "fair."   (Tr. 391.) Lietzau continued Plaintiff's medications at current levels.  (Tr. 391.)

Plaintiff returned to the Bethesda Clinic on November 17 and was seen by Leah Witt and Dr. Ogbogu.  (Tr. 412, 413.)  Plaintiff was in "no distress, comfortable, [and] pleasant," but had a "flat affect, mild anxiety."  (Tr. 413.)  Plaintiff reported that "she has been cancelling psychology/other appointments and staying in the house."  (Tr. 413.) Witt assessed Plaintiff with major depression and noted that Plaintiff would continue with her medications as prescribed.  (Tr. 413.)   Plaintiff's Ambien prescription was also continued and, in response to dependency concerns, Plaintiff was advised "that she can cut tabs in half in order to wean self down/decrease tolerance."  (Tr. 412-13.)

Dr. Ogbogu saw Plaintiff again on December 3 for reasons unrelated to her mental health.  (Tr. 410.)  Plaintiff was again in "no distress, comfortable, [and] pleasant."  (Tr.

411.)  Dr. Ogbogu noted that Plaintiff "has been doing well so far without psychotic features" and continued her medications as prescribed.  (Tr. 411.)

### D. 2010

On January 28, 2010, Plaintiff met with Dr. Ogbogu to have a form completed. (Tr. 408, 409.)  Plaintiff reported that she "is still depressed every[]day[ and d]oes [not] feel like participating in activities."  (Tr. 408.)  Plaintiff also did not feel the Ambien was working anymore.  (Tr. 408.)  Dr. Ogbogu observed that Plaintiff was in "no distress, comfortable, [and] pleasant."  (Tr. 409.)  Dr. Ogbogu assessed Plaintiff as having major depression.  (Tr. 409.)  Dr. Ogbogu advised Plaintiff to keep an upcoming appointment with her psychiatrist and to continue taking her Paxil and Depakote prescriptions.  (Tr. 409.)  Dr. Ogbogu also completed the form, indicating Plaintiff has severe depression and is compliance with treatment, but does not appear to be improving.  (Tr. 409.)

Plaintiff saw Hollis at the beginning and end of February.  (Tr. 599, 600.)  Prior to these visits, Plaintiff had not seen Hollis in seven months.  (Tr. 600.)  Plaintiff reported that she has been under increased stress on account of her financial situation and her mother, sister, and sister's children coming to live with her.  (Tr. 599, 600.)  Plaintiff also reported that she is "having some problems [with] mood swings" and "[i]s afraid to go out."  (Tr. 599.)  Hollis assessed Plaintiff as having bipolar disorder and PTSD.  (Tr. 600.)  Hollis noted that Plaintiff should work on maintaining boundaries with her mother and sister and practice relaxation techniques at night in order to help her sleep.  (Tr. 600.)

Plaintiff saw Dr. Ogbogu again on February 25.  (Tr. 496.)  Plaintiff reported that feeling "depressed most days" and having trouble sleeping, and did not think her

28

medications were helping. (Tr. 496.) Plaintiff was seeing her psychiatrist and psychologist. (Tr. 496.) Dr. Ogbogu noted that there were "[n]o hallucinations or suicidal ideation." (Tr. 496.) Plaintiff was in "no distress, comfortable, [and] pleasant" and had an "appropriate mood." (Tr. 497.) Dr. Ogbogu recommended that Plaintiff continue taking Paxil and Depakote and meeting with her psychiatrist and psychologist. (Tr. 497.) Dr. Ogbogu also "advised [Plaintiff] to start exercising/going to the gym." (Tr. 497.) Dr. Ogbogu indicated that tremors Plaintiff reported were likely a side effect of the Paxil and prescribed propranolol[15] to treat them. (Tr. 496, 497.)

Plaintiff next met with Hollis on March 23 and during the following week. (Tr. 597, 598.) During both appointments, Plaintiff expressed apprehension over her mother, sister, and sister's children moving in with her. (Tr. 597, 598.) Hollis encouraged Plaintiff to keep her medical appointments, try to keep stress to a minimum, and employ a coping strategy. (Tr. 597, 598.)

Plaintiff was seen by Dr. Ogbogu in early April for medication concerns. (Tr. 494.) Plaintiff reported that "she was busy in the past week and has[ no]t been taking her medications . . . . [Plaintiff] started feeling more irritable in the past two days and is wondering if she can go back on the medications." (Tr. 494-95.) Dr. Ogbogu observed that Plaintiff was in "no distress, comfortable, [and] pleasant." (Tr. 495.) Dr. Ogbogu listed Plaintiff's diagnosis as "[m]oderate depression with psychotic features" and advised Plaintiff to resume taking her medications. (Tr. 495.)

---

[15] Propranolol is used to "[t]reat[] high blood pressure, angina, uneven heartbeat, and tremors, and prevents migraine headaches." *Propranolol (By mouth)*, PubMed Health, Nat'l Ctr. for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011873/?report=details (last visited July 9, 2014).

Plaintiff saw Hollis the following day. (Tr. 596.) Plaintiff reported that she has been "a bit anxious [and] has been biting [her] nails" and picking at her skin. (Tr. 596.) Hollis encouraged Plaintiff to continue walking each day, stating it was good for both anxiety and Plaintiff's mood level. (Tr. 596.)

Plaintiff was seen by Sushila Mohan, M.D., at Associated Clinic of Psychology on April 13 for medication management. (Tr. 448.) Dr. Mohan noted that Plaintiff "is fairly stable except for the situational issues." (Tr. 448.) Plaintiff reported that the recent arrival of her mother, sister, and sister's family "means a lot of work for her." (Tr. 448.) Plaintiff attributed her low mood to "the stress at home." (Tr. 448.) Plaintiff's "medications seem to be working fine" and Plaintiff denied having any side effects. (Tr. 448.) Dr. Mohan observed that Plaintiff was "[c]asually attired, affect a bit subdued." (Tr. 448.) Dr. Mohan noted that "[s]ituational issues [were] impacting [Plaintiff's] mood"; Plaintiff was cognitively aware with "[n]o neurovegetative symptoms of depression" and "[n]o overt psychosis"; and Plaintiff's "[i]nsight and judgment are reality based." (Tr. 448.) Dr. Mohan gave Plaintiff a GAF score of 60 to 65. (Tr. 448.) Dr. Mohan continued Plaintiff's medications at their current levels and told Plaintiff to return in three months. (Tr. 448.)

When Plaintiff saw Dr. Pomrenke on May 26 for a complaint unrelated to her mental health, Plaintiff reported that her depression had "increased." (Tr. 492.) Plaintiff's PHQ-9 score was 10. (Tr. 492.) Dr. Pomrenke described Plaintiff as "[s]lightly depressed, not tearful, goal directed[,] eye contact, communicative" and noted that Plaintiff had an appointment with her psychiatrist in two days. (Tr. 493.)

30

Dr. Ogbogu saw Plaintiff on June 10 for a follow-up appointment concerning her depression.  (Tr. 484.)  Plaintiff reported that "her moods are worse"; she is not able to get enough sleep "and wakes up feeling very energetic"; and she has become "increasingly irritable."  (Tr. 484.)  Plaintiff stated that "[s]he tends to clean the house a lot and could go on cleaning even when she has an appointment in a few minutes."  (Tr. 484.)  Plaintiff reported that her symptoms have worsened over the last month, which "coincided with her mother coming to stay with her."  (Tr. 485.)  Dr. Ogbogu noted that Plaintiff's "mother has multiple medical problems and the pressure of taking care of her is getting to [Plaintiff] emotionally and physically."  (Tr. 485.)  Plaintiff denied having suicidal ideations as well as visual and auditory hallucinations.  (Tr. 484.)

This time, Dr. Ogbogu assessed Plaintiff as having bipolar disorder and noted that "her symptoms appear consistent with bipolar disorder [rather] than a [m]ajor [d]epression with psychotic features."  (Tr. 485.)  Dr. Ogbogu increased Plaintiff's Depakote prescription, directing Plaintiff to increase it again after one week.  (Tr. 485.)  Dr. Ogbogu also ran tests to check, among other things, the level of Depakote in Plaintiff's blood.  (Tr. 485.)

When Plaintiff followed up with Dr. Ogbogu one week later, she reported that she believes the increased Depakote prescription is helping because "[s]he is less irritable and sleeps better."  (Tr. 481.)  Plaintiff's "overall mood[, however,] ha[d] not improved."  (Tr. 481.)  Dr. Ogbogu observed that Plaintiff was in "no distress, comfortable[, and] pleasant."  (Tr. 481.)  Dr. Ogbogu increased Plaintiff's Depakote prescription again and made the following notes:

31

> Bipolar disorder II: Although in the past she had indicated that she takes her medication regularly, after questioning her, it appears she misses some doses.  Partly because she forgets to take them.  She does[ no]t appear to know how often she misses these doses. . . .  She will benefit from a weekly nurse visit to ensure she is complying to medication.  I talked to patient about getting a pill box to help set up her medications.

(Tr. 483.)

Plaintiff met with Dr. Ogbogu again on June 24 to evaluate the increased dose of Depakote.  (Tr. 479.)  Although Plaintiff did not report any side effects during the week before, her moods were still "low" and she still had difficulty sleep.  (Tr. 479.)  Plaintiff described feeling "anxious the night before an appointment or event and [being] unable to sleep because she is overwhelmed by the thoughts of that particular activity."  (Tr. 479.) Plaintiff also reported "wak[ing] up with lots of energy."  (Tr. 479.)  Additionally, Plaintiff stated that "[s]he has little interest in activities."  (Tr. 479.)  Dr. Ogbogu noted that "[w]e have discussed in the past going to [the] gym or participating in leisure activities, walking, exercising etc.  She would like to do them but at times is not motivated."  (Tr. 479-80.)

In assessing Plaintiff, Dr. Ogbogu concluded that bipolar disorder was the more likely diagnosis but "further diagnostic clarification will be needed."  (Tr. 480.) Additionally, Dr. Ogbogu noted:

> She is quite forgetful and I doubt she really takes her medications as prescribed.  It became apparent to me as the vitamin D level had[ no]t gone up significantly even after high doses of [vitamin] D. On her last visit, she endorsed forgetting to take her medications and this might have happened on more than one occasion.  I had suggested getting a pill box which she currently does[ no]t have. . . . I discussed

32

> with the DIAMOND contact here in the clinic to try and set
> her up with a case manager and nurse visits to help set up
> medications and ensure she is complying to these
> medications.

(Tr. 480.)  Dr. Ogbogu made no changes to Plaintiff's medications at this time.  (Tr. 480.)

Plaintiff's next session with Hollis was on June 28, over two months after her last session.  (Tr. 595.)   Plaintiff reported feeling badly after she had an argument with her sister wherein she told her sister and her kids to get out of her house.  (Tr. 595.)  Hollis counseled Plaintiff to make appointments with Drs. Mohan and Lietzau.  (Tr. 595.)

Plaintiff had an additional follow-up appointment with Dr. Ogbogu on June 30. (Tr. 477.)   Plaintiff answered "yes" when asked whether she had often felt down, depressed, or hopeless in the past month and whether she had been bothered by feelings of little interest or pleasure in doing things.  (Tr. 477.)   Listing Plaintiff's historical diagnoses of PTSD, obsessive compulsive disorder, and depression,[16] Dr. Ogbogu noted that Plaintiff still

> has low moods daily and has not improved.  She endorses
> symptoms of agitation and difficulty sleeping.  She has a
> history of [obsessive compulsive disorder] and reports
> cleaning repeatedly . . . .  She has[ no]t been compliant with
> her medication including the recent increase in her
> [D]epakote.  There is still need for diagnostic clarification as
> she does have a complicated history and has[ no]t had much
> improvement  in symptoms.  I discussed with her the need to
> get her set up with a nurse visit and case manager to help
> ensure medication compliance.   She adheres to all her
> scheduled visits.  She seems to be forgetful at times but
> otherwise appears interested in her care.

---

[16] Curiously, Dr. Ogbogu left out the more recent bipolar diagnosis.  (*See, e.g.*, Tr. 485, 483, 480.)

(Tr. 478.)   Dr. Ogbogu assessed Plaintiff as having major depression and obsessive compulsive disorder.  (Tr. 478.)

Plaintiff saw Dr. Mohan again on July 13.  (Tr. 447.)  Dr. Mohan's observations of Plaintiff were much the same.  (*Compare* Tr. 447 *with* Tr. 448.)  This time, however, Dr. Mohan gave Plaintiff a GAF score of 55 to 60.  (Tr. 447.)  Dr. Mohan noted that Plaintiff was stressed on account of her mother and sister staying with her, including the "fall out" Plaintiff had with her sister.  (Tr. 447.)  Dr. Mohan continued Plaintiff's medications at their current levels and told Plaintiff to follow up in three months.  (Tr. 447.)

On July 14, Plaintiff was seen at the Bethesda Clinic by Sarah Masrud, M.D., for a complaint unrelated to her mental health.  (Tr. 469.)  When asked if she had felt down, depressed, or hopeless in the last month or bothered by a lack of interest or pleasure in doing things, Plaintiff answered "yes" to both questions.  (Tr. 469.)

Plaintiff met with Hollis on July 21.  (Tr. 594.)  Plaintiff reported that she is "feeling good about taking responsibility for [her] mother," who recently moved into an apartment.  (Tr. 594.)  Plaintiff also reported having some reconciliation with her sister. (Tr. 594.)  Plaintiff told Hollis that she "has been having more mood swings," which she described as "clean[ing] too much."  (Tr. 594.)  Plaintiff wanted to begin treating her PTSD symptoms and Hollis gave her diaphragmatic breathing exercises.  (Tr. 594.)

Plaintiff returned to the Bethesda Clinic approximately three weeks later for a concern unrelated to her mental health; she was seen by Cherilyn Wicks, M.D.  (Tr. 465, 466.)  Plaintiff again answered "yes" to feeling depressed and having little interest in doing things over the past month.  (Tr. 465.)  Dr. Wicks noted that Plaintiff "does have

some depression symptoms today" and administered the PHQ-9, wherein Plaintiff scored 16.  Dr. Wicks also noted Plaintiff's bipolar-disorder diagnosis.  (Tr. 465.)  Plaintiff reported that "[s]he feels like things are stable although she does have some depression symptoms still."  (Tr. 466.)  Dr. Wicks observed that Plaintiff's "[m]ood is depressed; her "[a]ffect appears normal"; "[s]he has good eye contact"; "[h]er speech is normal[,] . . . not pressured"; and her "[t]houghts seem logical and she denies suicidal or homicidal ideation."  (Tr. 466.)  Dr. Wicks told Plaintiff to "continue to follow-up with her psychologist and psychiatrist" and gave Plaintiff "a crisis number handout" but noted that Plaintiff "appears stable though."  (Tr. 466.)

Plaintiff's next session with Hollis was on August 17.  (Tr. 592.)  Plaintiff reported that her partner of 30 years is leaving her because "he[ ha]s had enough."  (Tr. 592; *see also* Tr. 593.)  Hollis noted that Plaintiff "feels a lack of support due to [his] leaving."  (Tr. 592.)  Hollis noted that Plaintiff's partner still helps take care of the children, but is "tired of [Plaintiff's] angry spells."  (Tr. 592.)  Plaintiff reported "[f]eel[ing like her] mood swings are 'wrecking her life.'"  (Tr. 592.)  Hollis encouraged Plaintiff to practice diaphragmatic breathing and visualization and referred Plaintiff to Jennifer Wolfe, CNS, with Associated Clinic of Psychology, to address Plaintiff's bipolar disorder.  (Tr. 588, 592, 593.)

Plaintiff was seen at the Bethesda Clinic for a complaint unrelated to her mental health on September 20.  This time, when asked if she felt depressed in the last month or was bothered by a lack of interest in doing things, Plaintiff answered "no" to both questions.  (Tr. 461.)  When Plaintiff had a follow-up appointment for the unrelated

condition approximately ten days later, however, Plaintiff answered "yes" to both questions. (Tr. 458.) Casey Martin, M.D., noted that Plaintiff expressed "concern[]" about her psychiatric diagnoses and her medications." (Tr. 459.) Plaintiff reported that she "has been taking divelproex [sic]"[17] for the "past few months," but does not feel it has been helping. (Tr. 459.) Dr. Martin observed that Plaintiff was in "no distress, comfortable, [and] pleasant" and had an "appropriate mood." (Tr. 459.)

Plaintiff met with Hollis on September 27. (Tr. 591.) She reported "cleaning [and] washing constantly" and increased mood swings. (Tr. 591.) Hollis counseled Plaintiff to "[u]se relaxation techniques" and "[g]et out each day." (Tr. 591.)

Plaintiff returned to the Bethesda Clinic on October 5 with a complaint unrelated to her mental health. (Tr. 456.) When asked if she felt depressed in the last month or was bothered by a lack of interest in doing things, Plaintiff answered "yes" to both questions. (Tr. 456.)

Plaintiff first met with Jennifer Wolfe, CNS, on October 12. (Tr. 610.) Plaintiff reported experiencing depression for most of her life and she started having mood swings as a teen. (Tr. 610.) Plaintiff described her depression as "[m]oody, quiet, isolative, needs quiet, passive suicidal ideation, stay in bed," and her mania as "[a]ngry, rage, trying to start fights, would like to party [and] spend a lot, cleans obsessively." (Tr. 610.) Plaintiff also reported PTSD symptoms surrounding the shooting of her son and her children's friend, including "numb, flashbacks, poor sleep." (Tr. 610.) Additionally,

---

[17] Depakote is also a brand name for divalproex, a medication which "treats the manic phase of bipolar disorder." *Divalproex (By mouth)*, PubMed Health, Nat'l Ctr. for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0009998/ (last visited July 9, 2014). *See also supra* n.14.

Plaintiff reported that she has always had low self-esteem and her mood "switches every several days." (Tr. 610.)   Plaintiff reported having "auditory [and] visual hallucinations when very depressed[] after her child was shot." (Tr. 610.)   Plaintiff also stated that "[h]er mind wanders off to bad things when she tries to read." (Tr. 610.)   Plaintiff had a hard time paying attention in school, but was "not in any special classes" and "did[ not] get into trouble." (Tr. 610.)

In assessing Plaintiff's mental health status, Wolfe observed that Plaintiff's appearance was "[n]eat, appropriate"; she had appropriate eye contact, speech, and motor skills; her energy "fluctuates"; her mood was "[d]epressed, fluctuates"; her affect was "[c]ongruent"; she had poor self-esteem; she was cooperative and oriented; she had "[l]imited" attention/focus; she had "[n]o apparent [memory] problems"; her knowledge was "[g]ood"; her insight/judgment was "[f]luctuating"; she had a general mistrust of others; her thought process was "[l]ogical, coherent"; and she was goal-directed. (Tr. 610.)   Wolfe noted that Plaintiff "has ongoing difficulties with affect dysregulation, particularly anger, which has caused regular job loss." (Tr. 611.)

Wolfe assessed Plaintiff as having bipolar disorder, PTSD, and insomnia. (Tr. 611.)   Wolfe also noted that Plaintiff was "[s]omatic" and "go[ing] to [the] doctor every [two] weeks." (Tr. 611.)   Wolfe gave Plaintiff a GAF score of 41. (Tr. 611.)   Wolfe increased Plaintiff's Depakote prescription and suggested that Plaintiff try taking propranolol when she "first begin[s] to get angry." (Tr. 612.)   Wolfe also encouraged Plaintiff to exercise daily. (Tr. 611.)

Plaintiff's next session with Hollis was on October 20.  (Tr. 590.)  Plaintiff reported that her mother calls her multiple times per day.  (Tr. 590.)  Plaintiff told Hollis that she is responsible for "keeping" her mother's appointments.  (Tr. 590.)  Plaintiff also reported having trouble with her temper when her children have too many friends over. (Tr. 590.)  Hollis encouraged Plaintiff to work on her relaxation exercises and limit the number of visitors while Plaintiff works on her PTSD.  (Tr. 590.)  Hollis also encouraged Plaintiff to talk with her older children about her episodes of sleepwalking and eating and have them tell her when she has engaged in these behaviors.  (Tr. 590.)

Dr. Wicks saw Plaintiff again on November 16 for a condition unrelated to her mental health.  (Tr. 526.)  When asked if she felt depressed in the last month or was bothered by a lack of interest in doing things, Plaintiff answered "yes" to both questions. (Tr. 526.)  Plaintiff's PHQ-9 score was 24.  (Tr. 526, 527.)  Dr. Wicks noted that Plaintiff's depression "is a chronic issue."  (Tr. 527.)  Plaintiff reported that the services of her psychologist and her psychiatrist were "helpful."  (Tr. 527.)  Dr. Wicks noted that Plaintiff was taking her Depakote and Paxil prescriptions, but that Plaintiff did not find them to be very helpful.  (Tr. 527.)  Dr. Wicks encouraged Plaintiff to raise this issue with her psychiatrist.  (Tr. 527.)  Dr. Wicks also noted that Plaintiff "does have thoughts that she would be better off dead at times.  It has been a little worse this week.  She is not sure why.  No real stressors she can pinpoint.  No plan, however, and no real intent to follow through on this."  (Tr. 527.)  Dr. Wicks observed that Plaintiff was "[i]n no acute distress[ and] alert and orientated."  (Tr. 527.)  Dr. Wicks concluded that Plaintiff was "stable" despite "not[ing] a lot of depression symptoms."  (Tr. 527.)

Plaintiff had a session with Hollis the following day.  (Tr. 589.)  Plaintiff reported that her "[s]ignificant other . . . most likely has another girlfriend."  (Tr. 589.)  Plaintiff also reported that she has been "much less 'explosive'" since limiting the number of her children's guests.  (Tr. 589.)  Plaintiff told Hollis that she was having difficulty remembering to take her medication.  (Tr. 589.)  To address this problem, Plaintiff planned on enlisting the help of her adult daughter, using a days-of-the-week pillbox, and placing a note on her pillow.  (Tr. 589.)

Plaintiff met with Wolfe again on November 23.  (Tr. 588.)  Plaintiff told Wolfe that her rages, depression, and PTSD symptoms were "improving."  (Tr. 587.)  Wolfe still assessed Plaintiff as having a GAF score of 41.  (Tr. 587.)  Plaintiff reported that she forgets to take her Depakote and does not think the Paxil is working.  (Tr. 588.)

Plaintiff also met with Hollis the same day.  (Tr. 586.)  Plaintiff told Hollis that her "youngest sister [was] causing trouble."  (Tr. 586.)  Hollis encouraged Plaintiff to rethink boundaries with her family and Plaintiff reported that she was "feeling much better" about controlling her environment.  (Tr. 586.)  Hollis counseled Plaintiff to practice her relaxation exercises in preparation for working on her PTSD.  (Tr. 586.)

Plaintiff met with Hollis again on December 8.  (Tr. 585.)  Plaintiff reported concerns about her mother "who is quite controlling" and calls Plaintiff multiple times per day.  (Tr. 585.)  Plaintiff also reported having a "major panic attack" due to pain in her hands.  (Tr. 585.)  Hollis encouraged Plaintiff to "[c]ontinue limiting visitors/chaos at home" and practice her relaxation exercises to help with her PTSD and panic attacks.  (Tr. 585.)

Plaintiff was seen by Paul Schaefer, M.D., on December 9 for a complaint unrelated to her mental health.  (Tr. 522.)  This time, when asked if she felt depressed in the last month or was bothered by a lack of interest in doing things, Plaintiff answered "no" to both questions.  (Tr. 522.)

Approximately one week later, Plaintiff saw Dr. Martin for a complaint unrelated to her mental health.  (Tr. 520.)  Dr. Martin noted that Plaintiff "does have a history of bipolar disorder and has been having an exacerbation of her depressive symptoms.  She has been seeing her psychologist twice a week and has been seeing her psychiatrist once monthly and feels as though her needs in this area are being addressed."  (Tr. 521.)  Plaintiff was in "no distress, comfortable, [and] pleasant."  (Tr. 521.)

The following day, Plaintiff met with Wolfe.  (Tr. 584.)  Wolfe again increased Plaintiff's Depakote, started Plaintiff on Xanax[18], and stopped Plaintiff's Ambien prescription.  (Tr. 584.)  Wolfe noted that Plaintiff had a panic attack and was still experiencing rages, depression, and PTSD.  (Tr. 584.)

Plaintiff had a session with Hollis on December 27.  (Tr. 583.)  Plaintiff reported that her ex-partner "is behaving strangely."  (Tr. 583.)  Plaintiff was upset that her ex-partner had impregnated an 18-year-old girl and was planning on marrying another woman with whom he has apparently been living during the past year.  (Tr. 583.)  Hollis encouraged Plaintiff to think about her long-term goals.  (Tr. 583.)

---

[18] Xanax is a brand name for alprazolam, which "is used to relieve symptoms of anxiety, including anxiety caused by depression."  *Alprazolam (By mouth) (Xanax)*, PubMed Health, Nat'l Ctr. for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0008896/ (last visited July 11, 2014).

### E.  2011

Plaintiff saw Dr. Martin again on January 18, 2011, for a complaint unrelated to Plaintiff's mental health.  When asked if she felt depressed in the last month or was bothered by a lack of interest in doing things, Plaintiff answered "yes" to both questions. (Tr. 518.)  Plaintiff "report[ed] that she has been under quite a bit of stress lately with her ex[-]partner."  (Tr. 519.)  Plaintiff also "report[ed] that she has had some changes in her psyche regimen of late.  She does not know the names of her medications."  (Tr. 519.) Plaintiff was in "no distress, comfortable, [and] pleasant."  (Tr. 519.)

Plaintiff also met with Ila Harris, Pharm. D., at the Bethesda Clinic to discuss her medications.  (Tr. 515.)  Harris noted several discrepancies and outdated information in Plaintiff's records.  (Tr. 516, 517.)  Harris also noted that Plaintiff "admitted to non-adherence and has difficulty remembering to take her meds.  She tried a pill box but had trouble with that too.  S[h]e takes some meds in [the morning] and some in [the evening]. . . . [Plaintiff] denies problems or side effects from her meds."  (Tr. 516.)  Harris counseled Plaintiff on the importance of taking her medication on a regular basis.  (Tr. 517.)  Harris noted that Plaintiff's 18-year-old daughter "will start setting up [Plaintiff's] med[ication] in a pill box."  (Tr. 517.)

Plaintiff met with Hollis on January 19.  (Tr. 582.)  Plaintiff reported that she had an ulcer, which is being treated with medication and changes in diet, and has not been feeling well.  (Tr. 582.)  Plaintiff also reported that things with her mother were getting better and her ex-partner apologized and wanted to come back home.  (Tr. 582.)  Hollis

encouraged Plaintiff to continue limiting chaos in her life and think about whether she wanted her ex-partner back in her life.  (Tr. 582.)

Plaintiff had an appointment with Wolfe the next day.  (Tr. 580, 581.)  Plaintiff reported a "small improvement" in her rages, but no changes in her mood or PTSD.  (Tr. 580.)  Plaintiff's GAF score is listed as 41.  (Tr. 580.)  Wolfe noted that Plaintiff is "[s]till not taking Depakote regularly, which explains lack of improvement."  (Tr. 580; *see also* Tr. 581.)  Wolfe reminded Plaintiff to take her medication every day.  (Tr. 581.)

Plaintiff returned to Bethesda Clinic on January 24 for a complaint unrelated to her mental health.  (Tr. 512.)  When asked if she felt depressed in the last month or was bothered by a lack of interest in doing things, Plaintiff answered "no" to both questions.  (Tr. 512.)  Plaintiff was observed to be in "no distress, comfortable, [and] pleasant" and had an "appropriate mood."  (Tr. 513.)

On February 3, Plaintiff saw Dr. Martin at the Bethesda Clinic for complaints unrelated to her mental health.  (Tr. 510, 511.)  Again, when asked if she felt down, depressed, or hopeless in the last month or had been bothered by a lack of interest or pleasure in doing things, Plaintiff answered "no" to both questions.  (Tr. 510.)  Plaintiff was in "no distress, comfortable, [and] pleasant" and had an "appropriate mood."  (Tr. 511.)  Dr. Martin saw Plaintiff again four days later.  (Tr. 508.)  Plaintiff responded similarly and was observed to be in the same condition.  (Tr. 508, 509.)

Plaintiff had a follow-up appointment with Wolfe on February 16.  (Tr. 578.) There were no changes in Plaintiff's rages, mood, or PTSD.  (Tr. 578.)  Plaintiff's GAF score was listed as 41.  (Tr. 578.)  Noting that Plaintiff was not seeing an effect with

Depakote, Wolfe discontinued this prescription and started Plaintiff on Saphris.[19]   (Tr. 578.)  Wolfe also noted that Plaintiff was "having panic attacks at night," but that these were being addressed along with Plaintiff's trauma issues in therapy.  (Tr. 578.)

Plaintiff also met with Hollis the same day.  (Tr. 577.)  Plaintiff reported that her ex-partner is "gone for good" and "has moved back in [with his] girlfriend."  (Tr. 577.) Plaintiff stated, however, that he still spends time with the children and that she "feels 'good' about [their] new relationship."  (Tr. 577.)  Hollis noted that Plaintiff needed to set boundaries with her ex-partner.  (Tr. 577.)  Hollis also noted that Plaintiff was going to court in April regarding custody payments and was concerned that she would be arrested due to the outstanding warrant.  (Tr. 577.)  Hollis also made notes regarding a work form and suggested that Plaintiff consider volunteering at a hospital in order to get some experience as Plaintiff mentioned wanting to work in the medical field.  (Tr. 577.)

Plaintiff saw Dr. Wicks on February 18 for an unrelated concern.  (Tr. 501.)  This time, when asked if she felt depressed in the last month or was bothered by a lack of interest in doing things, Plaintiff answered "yes" to both questions.  (Tr. 501.)  Plaintiff's PHQ-9 score was 22.  (Tr. 502.)  Plaintiff reported "having trouble with her depression" and "having morning anxiety attacks for the past two to three weeks."   (Tr. 503.) Plaintiff was otherwise observed to be in "no distress, comfortable, [and] pleasant" and had an "appropriate mood."  (Tr. 502.)

---

[19] Saphris is a brand name for asenapine and is used to "treat[s] schizophrenia and bipolar disorder."  *Asenapine (By mouth) (Saphris)*, PubMed Health, Nat'l Ctr. for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0009117/ (last visited July 10, 2014).

Plaintiff had another session with Hollis on February 23, wherein she reported that she was "doing well" and "made numerous plans for [her]self," including attending the orientation for a GED program and becoming a member of the YWCA.  (Tr. 576.)  Hollis noted that Plaintiff "is *very* positive currently."  (Tr. 576.)  Plaintiff did report having panic attacks at night after speaking with her ex-partner.  (Tr. 576.)

Plaintiff met with Wolfe on February 24.  (Tr. 574.)  Plaintiff reported that her panic attacks were "[w]orsening" and she was waking up at night.  (Tr. 574.)  Plaintiff was unclear whether the Saphris is helping and Wolfe noted that Plaintiff "is dealing with significant betrayal [and] desertion by the father of [six] of her children."  (Tr. 574.)  Plaintiff's GAF score was listed as 41.  (Tr. 574.)  Wolfe added temazepam[20] to help Plaintiff sleep.  (Tr. 574.)

Plaintiff followed up with Dr. Wicks on February 25.  (Tr. 499.)  Although Plaintiff responded "yes" when asked if she felt depressed in the last month, Plaintiff also reported that she was "see[ing] a [d]octor for this problem . . . [and] is doing exerci[s]e and doing well."  (Tr. 499.)  Plaintiff answered "no" when asked if she was bothered by a lack of interest in doing things.  (Tr. 499.)  Dr. Wicks noted that Plaintiff was being seen by "a psychiatrist, [Wolfe], who just changed some of her medications."  (Tr. 500.)  This change included a prescription for [g]abapentin[21] for pain and anxiety."  (Tr. 500.)  Plaintiff reported that she "was very hesitant to start [her gabapentin prescription] as she

---

[20] Temazepam is used to treat insomnia.  *Temazepam (By mouth)*, PubMed Health, Nat'l Ctr. for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0012321/ (last visited July 11, 2014).

[21] Gabapentin is a medication traditionally used to treat certain types of seizures, Restless Legs Syndrome, and the pain caused by shingles.  *Gabapentin (By mouth)*, PubMed Health, Nat'l Ctr. for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010419/ (last visited July 10, 2014.)

was worried about all of her medications causing suicidality or exacerbating anxiety attacks." (Tr. 500.)    Dr. Wicks observed that Plaintiff's "[v]ital signs are stable"; she was in "[n]o acute distress" and "[a]lert and orientated"; her "[a]ffect is normal"; and, while her "[m]ood is a bit depressed . . . [,] anxiety [is] improving." (Tr. 500.)  Dr. Wicks noted that Plaintiff "will continue to follow" her medications as prescribed. (Tr. 500.)

On February 28, Plaintiff was admitted for psychiatric hospitalization after she took "5 Xanax pills in an attempt to kill herself." (Tr. 539.)  Plaintiff reported "feeling increasingly dysphoric in the last several days in the context of increasing relationship chaos and . . . stress that has been occurring since this past summer." (Tr. 539.)  Plaintiff stated that December 21, 2010, however, "was the date that changed my life." (Tr. 539.)  Plaintiff received a call from her son's 18-year-old ex-girlfriend, who let Plaintiff know she was pregnant by Plaintiff's ex-partner. (Tr. 539.)  Shortly thereafter, Plaintiff's ex-partner moved in with another woman. (Tr. 539.)  "[B]etween the partner's impregnation of [her son's ex-girlfriend], as well as [his] living with this new woman," Plaintiff reported that "'it has been the worst 6 months.'" (Tr. 539.)

Plaintiff reported that "her work with Jennifer Wolfe and [Hollis]" was "very supportive" in helping her cope and her medications were working. (Tr. 539, 540.)  According to Plaintiff, things "'just came to a head the other day'" when her ex-partner attempted to introduce her daughter to the woman he is currently living with despite Plaintiff's request that he not "involve the kids in all this mess." (Tr. 540.)  Plaintiff stated that she "'just snapped'" and is glad she survived. (Tr. 540.)

45

Plaintiff met with Christina H. Frazel, M.D., of Regions Hospital.  (Tr. 539; *see* Tr. 536.)  Dr. Frazel noted that Plaintiff "has significant stressors," including receiving "welfare for a number of years"; having her home foreclosed upon; and being "in an abuse cycle with this ex-partner."  (Tr. 540.)  Plaintiff also relayed the story of the party shooting to Dr. Frazel.  (Tr. 540.)  Dr. Frazel made the following observations:

> [Plaintiff] notes that mood has been, "exhausted," by what has been going on in her psychosocial realm. . . . She interestingly has this diagnosis of bipolar affective disorder, although when [this] writer goes through if there have been periods where she has decreased need for sleep with increased goal-directed activity or distractibility or talkativeness, disinhibition, etc[.,] she frankly denies that.  The most she states is, "I clean obsessively all the time because I get anxious if I don't, (denies true ritualism around that)."  She also states that she has initial insomnia, but that she denies any frank decreased need for sleep.

(Tr. 540.)

Dr. Frazel discussed with Plaintiff her psychiatric, chemical, medical, social, and family histories.  (Tr. 540-541.) Dr. Frazel also performed a mental status exam noting, among other things:

> She is fairly well-groomed.  She makes good eye contact. She is spontaneous and engaged in the discussion.  She appears to be a fairly good historian. . . . .  [H]er attitude is overall cooperative.  She shows no psychomotor agitation or slowing.  Her gait and station appear within normal limits. Her speech is of a regular rate and rhythm, spontaneous, good articulation.  Her mood is stated as, "just sick of all this."  Her affect is of good range, perhaps a bit subdued, tearful once when she states she[ i]s glad she survived.  She has a social smile.  She relates in a relaxed fashion.  Thought process is linear and goal directed.  Thought content is without hallucinations, delusions . . . . Associations are intact.  Insight is limited.  Judgment is limited.  She is alert and oriented . . . .

46

> Attention and concentration appear intact.  Recent and remote memory appear intact, although . . . she omitted legal history when [this] writer clearly asked about it.  Fund of knowledge appears average.  Language is intact.

(Tr. 541.)

Dr. Frazel diagnosed Plaintiff with "[a]djustment disorder with mixed disturbance of emotions and conduct."  (Tr. 542.)  Dr. Frazel noted a history of both "depression changed to bipolar affective disorder in 3/2010" and "PTSD (by my symptom review does not meet full criteria)."  (Tr. 542.)  Dr. Frazel noted additional issues with respect to "[r]elationship discord [and concomitant family disruption], . . . history of abuse, limited finances, limited housing, [and] poor self-esteem."  (Tr. 542.)  Dr. Frazel assessed Plaintiff with a GAF score of 41 to 50.  (Tr. 542.)

Plaintiff was discharged from Regions Hospital on March 2 by John Kuzma, M.D. (Tr. 536.)  Dr. Kuzma noted that "[t]hroughout her hospital stay, [Plaintiff] was calm, controlled, [and] cooperative . . . ."  (Tr. 537.)  Plaintiff also "[d]enie[d] any thoughts of wanting to harm herself and readily agreed to work with the team in developing and buttressing her outpatient supports."  (Tr. 538.)  Dr. Kuzma diagnosed Plaintiff with "[a]djustment disorder with mixed disturbances, emotions, and conduct"; "[d]epression, not otherwise specified"; PTSD; and "[a]nxiety disorder, not otherwise specified."  (Tr. 538.)  When Plaintiff was discharged, she was in no apparent distress, had a neutral mood, had "congruent [and] full featured" affect, and was alert and oriented with linear and goal-directed thought processes.  (Tr. 538.)  Dr. Kuzma noted that Plaintiff's "recent and remote memory is intact" and her "[f]und of knowledge is appropriate to her age and

education." (Tr. 538.) Dr. Kuzma described Plaintiff's insight and judgment as "grossly intact." (Tr. 538.) Dr. Kuzma rated Plaintiff at 55 on the GAF scale. (Tr. 538.)

On March 8, Plaintiff met with Dietrah Hiatt, L.I.C.S.W., in conjunction with a partial hospitalization program. (Tr. 563, 569; *see* Tr. 561.) Plaintiff and Hiatt discussed a number of topics, including medical conditions, mental health issues, stressors in Plaintiff's life, family background, and significant relationships. (Tr. 563-69.) Plaintiff reported having difficulty sleeping and "awaking nearly every night in a state of panic." (Tr. 563.) Hiatt noted the presence of the following symptoms of depression, among others: depressed mood/feeling sad (4 out of 7 days); decreased energy/lacking motivation; grief/loss issues related to past trauma and relationship stress; social withdrawal; irritability; hopelessness/helplessness; guilt/feelings of inferiority, relating to the party shooting; and memory problems, noting that Plaintiff "has become more forgetful recently." (Tr. 563-64.)

Similarly, Hiatt noted the presence of the following symptoms of bipolar disorder: irritability/anger; temper problems/poor self-control; pressured speech/talking too fast or too much; racing thoughts/inability to stop thinking; and intense focus on goal-directed activity, namely, cleaning. (Tr. 564.) Hiatt noted that Plaintiff's current symptoms "seem to be connected to recent stressors in [Plaintiff's] relationship problems as she reported feeling overwhelmed by the chaotic developments in her family life." (Tr. 564.)

Hiatt also noted the presence of paranoia/suspiciousness as a psychotic symptom, indicating that Plaintiff's "suspiciousness 'sometimes' appears related to distrust of [her] ex-partner." (Tr. 564.) Plaintiff reported experiencing additional psychotic symptoms in

the past including "a dissociative experience where [Plaintiff] lost awareness of her surroundings and found herself standing in traffic," and hallucinations.  (Tr. 564.)

Additionally, Hiatt noted the presence of the following symptoms of anxiety/obsessive compulsive disorder: repetitive behaviors, including cleaning and checking; panic attacks/fears of dying; rapid heartbeat, shortness of breath, and sweaty palms; and nausea/abdominal distress in the form of an ulcer.  (Tr. 564.)

Hiatt also documented symptoms of PTSD.  (Tr. 565.)  Hiatt noted that Plaintiff had experienced "trauma" in the form of sexual abuse by her stepfather and "witness to violent death of her [childen's] friend."  (Tr. 565.)  Plaintiff reported having intrusive thoughts, physiologic reactivity from cues, a heightened startle response, and "night terrors."  (Tr. 565.)  Plaintiff also reported thoughts and feelings of trauma; avoidance of activities, places, and people associated with the trauma; memories of the trauma; anhedonia; and social isolation.  (Tr. 565.)

Hiatt noted several stressors in Plaintiff's life: "extensive relationship problems; financial problems, including foreclosure on her home and now renting a house; legal/criminal history, including an outstanding arrest warrant for shoplifting."  (Tr. 565.)

Helen Wood, M.D., interviewed Plaintiff on March 9 in connection with the partial hospitalization program.  (Tr. 558.)  Dr. Wood's evaluation of Plaintiff was based on Hiatt's assessment and Dr. Wood's interview.  (Tr. 558.)  Dr. Wood noted that Plaintiff's mood was "calmer" and "a little depressed."  (Tr. 559.)  Plaintiff "state[d] her sleep is good, groups are going well, and her energy level is low." Tr. 559.)  Plaintiff denied feeling hopeless, helpless, worthless, or suicidal, but did "endorse feelings of

guilt." (Tr. 559.) Plaintiff reported having "a lot of anxiety," including panic attacks that became more frequent leading up to her suicide attempt but none since she was discharged from the hospital. (Tr. 559.) Plaintiff also reported needing to check to make sure doors were closed and to make her bed "a special way," but did not believe these activities interfered with her daily life. (Tr. 559.)

In addition, Plaintiff reported some manic/hypomanic symptoms in the last two years, including being more irritable, needing less sleep, and having racing thoughts. (Tr. 559.) Dr. Wood noted that Plaintiff "has difficulty trusting people and has some suspiciousness about others." (Tr. 559.) Although Plaintiff told Hiatt about past hallucinations and dissociate experiences, she did not tell Dr. Wood about them. (Tr. 559.) Dr. Wood observed that Plaintiff "does endorse many symptoms of PTSD, including flashbacks, nightmares, startle reflexes, hypervigilance, anger, lack of enjoyment, and avoidance. She does not socialize much and has insomnia." (Tr. 559.) Dr. Wood noted that Plaintiff has had only one psychiatric hospitalization, i.e., the most recent hospitalization resulting from the Xanax overdose. (Tr. 559; *see also* Tr. 566.)

When assessing Plaintiff's mental status, Dr. Wood observed that Plaintiff

> is clean, neat, well groomed, wearing casual clothing and is cooperative. . . . She makes good eye contact . . . . Speech is regular in rate, volume and rhythm and not at all pressured. Mood is "calmer, a little depressed." Affect is calm, euthymic, pleasant, and congruent with stated mood. Thought process is linear, logical, goal directed, and negative for loose associations or flight of ideas. Thought content is negative for suicidality, homicidality, psychotic symptoms, and manic symptoms. Insight and judgment are moderate. Use of language and fund of knowledge is appropriate. . . . Memory and concentration are intact.

(Tr. 561.)  Dr.  Wood diagnosed Plaintiff with PTSD, "Rule Out Bipolar Affective Disorder, NOS," and "Adjustment Disorder, with Mixed Disturbance of Emotion and Conduct."  (Tr. 561.)  Dr. Wood gave Plaintiff a GAF score of 45.  (Tr. 561.)  Dr. Wood discontinued Plaintiff's Xanax and propranolol prescriptions, among others, and directed Plaintiff to take Paxil in the morning rather than at night.  (Tr. 561, 562.)

Plaintiff saw Dr. Wood again on March 14 and 17.  (Tr. 554, 556.)  Plaintiff stated that she "really like[s]" the partial hospitalization program and that she is "doing good so far."  (Tr. 556.)  Plaintiff reported feeling better after the changes Dr. Wood made to her medication.  (Tr. 556.)  Plaintiff described her mood as "feeling pretty good."  (Tr. 554, 557.)  Dr. Wood noted that Plaintiff was "improving in both mood and function" and Plaintiff's likely diagnosis is chronic PTSD.  (Tr. 557.)  During one of these visits, Dr. Wood spent some time discussing family and relationship stressors with Plaintiff and referred her to the social worker for "more specific directives/resources."  (Tr. 557.)  Dr. Wood noted that Plaintiff "has stabilized psychiatrically and is doing well."  (Tr. 555.)

Plaintiff next met with Dr. Wood on March 21.  (Tr. 552.)  Plaintiff reported that her mood was "OK," but stated that she had a nice weekend with her children and "really feel[s] calm."  (Tr. 552, 553.)  Plaintiff reported that she enjoyed participating in "groups" and "look[s] forward to it."  (Tr. 552.)  Dr. Wood recommended that Plaintiff's gabapentin prescription be tapered because Plaintiff reported feeling "high."  (Tr. 553.)  Dr. Wood noted that Plaintiff was making "good progress at this time."  (Tr. 553.)

Plaintiff was discharged from the partial hospitalization program on March 25. (Tr. 550.)   Ann Miller, L.I.C.S.W., noted upcoming appointments with Plaintiff's psychiatrist (Lietzau), therapist (Hollis), and primary care provider (Dr. Wicks) on her discharge instruction sheet.   (Tr. 550, 551.)   Plaintiff was also referred to "Day Treatment" and the "Trauma Defusing Therapy Group."   (Tr. 551.)   On Plaintiff's discharge summary, Hiatt noted that Plaintiff was experiencing "less depression, mild anxiety, but no panic episodes" at the time of her discharge and gave Plaintiff a GAF score of 45.  (Tr. 548.)

Plaintiff met with Hollis on March 28 and reported the suicide attempt.  (Tr. 573.) Plaintiff told Hollis that she "could[ no]t take any more between [her] mother [and] [ex-]partner." (Tr. 574.)  Plaintiff said she "wanted to check out[, d]id[ no]t really want to wake up."  (Tr. 573.)   Hollis noted that Plaintiff had an upcoming court appearance and wrote a letter on behalf of Plaintiff so that Plaintiff was not afraid to go on account of the unresolved shoplifting charge.  (Tr. 573.)

Plaintiff had an appointment with Dr. Wicks on March 30 for a complaint unrelated to her mental health and a medication check.  (Tr. 650.)  When asked if she had often been depressed in the last month, Plaintiff answered "yes."  (Tr. 650.)  Plaintiff also answered "yes" when asked if she had been bothered by having little interest in doing things during the same time period.  (Tr. 650.)  Dr. Wicks noted that Plaintiff was not taking her gabapentin prescription on regular basis because it made her feel sleepy.  (Tr. 651.)  Dr. Wicks noted that "[r]ight now, [Plaintiff] is stable as far as her psychiatry issues go."  (Tr. 651.)  Dr. Wicks reassured Plaintiff that it would just take her body time

to get use to the gabapentin and she should work on increasing her dose up to the prescribed amount.  (Tr. 651.)

Plaintiff met with Lietzau again on April 12 for medication management.  (Tr. 607.)  Lietzau noted that it had been approximately two years since she had seen Plaintiff and, in the interim, Plaintiff was being seen by Wolfe.  (Tr. 607.)  Plaintiff denied being suicidal but stated she was feeling anxious and depressed and having difficulty sleeping. (Tr. 607.)  Lietzau noted:

> Her moods are rather labile as well.  Her PHQ-9 score is 14 and, she indicates anhedonia, some depression, sleep difficulties, decreased energy, feeling bad about herself, and some difficulties with concentration.  She also endorses symptoms for generalized anxiety including excessive worry and anxiety most days . . . , restlessness, tired, difficulty concentrating, mind going blank, irritability, muscle tension, and sleep issues.  [A mood] questionnaire . . . support[s] . . . the bipolar diagnosis indicating periods of feeling hyper, irritable, increased self-confidence, less sleep, more talkative, rapid speech, racing thoughts, easily distracted, more energy than usual, more active than usual, more interested in sex than usual, foolish risky behaviors, spending money that would get the family in trouble.  She indicates these symptoms have occurred at the same period of time, been a serious problem . . . .

(Tr. 607.)  Additionally, Plaintiff "report[ed that] she really does not have any support system or friends" and she "feels quite busy and overwhelmed at times" taking care of her five children living at home.  (Tr. 608.)

Lietzau noted the following when assessing Plaintiff's mental status:

> Appearance and grooming are casual.  Behavior is appropriate.  Eye contact is made.  Mood appears slightly depressed, affect appropriate.  Speech is clear. . . . Thought process is a bit tangential and at times circumstantial.  She

> does endorse racing thoughts from time to time. Abstract
> thinking is intact. She also endorses periods of time where
> she feels paranoid that people are out to get her, out watching
> her. Insight and judgment are fair. Cognition, [Plaintiff] is
> oriented to the day of the week, knows it is the second week
> of April but did not know the exact date. . . . Memory, she is
> able to recall last meal. She is unable to do serial sevens
> backwards.

(Tr. 608.) Lietzau diagnosed Plaintiff with depression and gave her a GAF score of 45.

(Tr. 608.) No changes were made to Plaintiff's medication. (Tr. 608-09.)

On April 29, Plaintiff presented at the Bethesda Clinic for reasons unrelated to her

mental health. (Tr. 645.) She was seen by Tou Sue Vang, M.D. (Tr. 646.) Plaintiff was

"alert" and "pleasant." (Tr. 646.) When asked if she felt depressed in the last month or

was bothered by a lack of interest in doing things, Plaintiff answered "yes" to both

questions. (Tr. 646.)

Lietzau saw Plaintiff again on May 3 and May 17. (Tr. 605, 606.) Plaintiff

reported feeling anxious and depressed and her sleep, appetite, and energy levels were all

down. (Tr. 605, 606.) During the May 3 visit, Lietzau observed that Plaintiff's

appearance, grooming, and speech were appropriate; she was fidgety; her mood "sad"

and "anxious" with a "constricted" affect; Plaintiff's thought process was tangential and

circumstantial; and her concentration, memory, and insight/judgment were all okay. (Tr.

606.) Lietzau increased Plaintiff's Paxil prescription at this time. (Tr. 606.) On May 17,

however, Plaintiff's mood and affect were now appropriate. (Tr. 605.) Lietzau increased

Plaintiff's gabapentin prescription during this second visit. (Tr. 606.)

Plaintiff was seen at the Bethesda Clinic on May 25 for a complaint unrelated to her mental health. (Tr. 637.) This time, when asked if she felt depressed in the last month or was bothered by a lack of interest in doing things, Plaintiff answered "no" to both questions. (Tr. 637.)

When Lietzau next saw Plaintiff on June 13, she was still feeling depressed and having difficulty sleeping. (Tr. 604.) Lietzau noted that, per Plaintiff's PHQ-9 score of 24, Plaintiff's mood was "sad" and her concentration was "distracted." (Tr. 604.) Plaintiff's affect was "constricted"; she appeared "relaxed"; she had "mild" impairments in her memory; and her insight/judgment was "fair." (Tr. 604.) Lietzau added Remeron[22] to Plaintiff's medication regimen.

Plaintiff returned to the Bethesda Clinic three times between June 14 and July 19 for complaints unrelated to her mental health. (Tr. 622, 633, 635.) During the first two visits, when asked if she felt depressed in the last month or was bothered by a lack of interest in doing things, Plaintiff answered "yes" to both questions. (Tr. 633, 635.) During the third visit, she responded "no" to both question. (Tr. 622.) Plaintiff was generally observed to be in "no distress, comfortable, [and] pleasant," (Tr. 623, 634) and had an "appropriate mood," (Tr. 634).

Plaintiff reported slight improvements in her anxiety and depression when she saw Lietzau on July 25. (Tr. 603.) She was still having difficulty sleeping and her energy level was down. (Tr. 603.) Plaintiff was described to be within normal limits, including

---

[22] Remeron is a brand name for mirtazapine, an antidepressant. *Mirtazapine (By mouth) (Remeron)*, PubMed Health, Nat'l Ctr. for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011242/ (last visited July 12, 2014).

an appropriate mood, logical thought process, and focused concentration.  (Tr. 603.)  The Remeron had no effect, so Lietzau discontinued it.  (Tr. 603.)  Lietzau started Plaintiff on Wellbutrin[23] and restarted her Ambien prescription.  (Tr. 603.)

Plaintiff was seen at the Bethesda Clinic on July 28, August 5, and August 22, again for complaints unrelated to her mental health.  (Tr. 614, 617, 619.)  Each time, when asked if she felt depressed in the last month or was bothered by a lack of interest in doing things, Plaintiff answered "no" to both questions.  (Tr. 614, 617, 619.)  During one visit, Plaintiff was observed to be in "no distress, comfortable, [and] pleasant" and had an "appropriate" mood.  (Tr. 618.)

On October 3, Hollis completed a mental impairment questionnaire concerning Plaintiff. (Tr. 653, 657.)  Hollis listed Plaintiff's diagnoses as bipolar disorder, panic disorder, and PTSD, and her GAF score as 41.  (Tr. 653.)  Hollis noted that Plaintiff's panic disorder became more apparent after her suicide attempt.  (Tr. 653.)  When asked to describe Plaintiff's symptoms, Hollis checked, among other things: sleep disturbance, mood disturbance, emotional lability, manic syndrome, recurrent panic attacks, feelings of guilt/worthlessness ("[a]t times"), difficult thinking or concentration, intense and unstable personal relationships or impulsive and damaging behavior, emotional withdrawal or isolation, decreased energy ("when depressed"), intrusive recollections of a traumatic experience, persistent irrational fears ("[f]rom PTSD"), generalized persistent anxiety, and hostility and irritability.  (Tr. 653.)  Hollis indicated that Plaintiff suffers

---

[23] Wellbutrin is a brand name for bupropion, a medication used to treat depression.  *Bupropion (By mouth) (Wellbutrin)*, PubMed Health, Nat'l Ctr. for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0009361/ (last visited July 12, 2014).

from fatigue when she is depressed due to her bipolar disorder and this fatigue is likely to impair Plaintiff's ability to work on a daily basis. (Tr. 654.)

Hollis answered "yes" when asked if Plaintiff "suffer[s] from a condition that would make her sensitive to stress" and "ha[s] a history of being overwhelmed with even basic life activities." (Tr. 654.) Plaintiff checked the following when asked to indicate which areas Plaintiff's low-stress-tolerance would likely affect on a regular basis: sensitivity to supervisor feedback, ability to get to work on time, ability to cope with change, tolerance of close contact with coworkers or customers, ability to focus for two-hour periods, and ability to handle routine work stresses. (Tr. 654.)

In describing the clinical findings demonstrating the severity of Plaintiff's impairments, Hollis wrote, "[Plaintiff] has uncontrollable mood swings; tries to isolate to control for mem. When she [canno]t, react impulsively." (Tr. 654.) Hollis did not believe that Plaintiff was feigning or exaggerating her symptoms. (Tr. 654.) Hollis indicated that medication managed Plaintiff's symptoms to "some extent" and "[c]ognitive behavioral therapy for mood control[]helps a bit." (Tr. 654.) Hollis described Plaintiff's prognosis as "[p]oor. [Plaintiff] has a chaotic home life [with] poor chance of financial independence due to mental health." (Tr. 655.) Hollis checked "yes" when asked if Plaintiff's "impairment lasted, or can be expected to last, at least 12 months." (Tr. 655.) When asked whether she had "observed evidence of a cognitive impairment or learning disability," Hollis checked "yes," explaining that Plaintiff "becomes easily overwhelmed, then frustrated [and] lowers concentration." (Tr. 655.)

Hollis indicated that Plaintiff's impairments would cause her to be absent from work more than three times per month.  (Tr. 655.)

As for Plaintiff's mental ability to perform unskilled work, Hollis rated as "fair" Plaintiff's ability to remember locations and work-like procedures; cope with brief, infrequent and superficial contact with coworkers; cope with brief, infrequent and superficial contact with the public; and ask simple questions or request assistance.  (Tr. 655, 656.)  Hollis rated as "poor or none" Plaintiff's ability to concentrate on, understand and remember very short and simple instructions; carry out routine tasks with adequate persistence and pace necessary to meet simple production quotas in a routine work setting; maintain attention and concentration for two-hour segments; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; make simple work-related decisions; complete a normal work-day and work-week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to supervisor criticism; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; deal with normal work stress; and adapt appropriately to changes in a routine work setting.  (Tr. 656.)  When asked to explain her rankings, Hollis stated that Plaintiff "does not react appropriately to supervision, she takes things personally, becoming upset/frustrated [with] . . . productivity."  (Tr. 656.)  Hollis indicated that Plaintiff was moderately restricted in her activities of daily living and very restricted in her ability to function socially and maintain concentration, persistence, and pace.  (Tr. 657.)

Finally, Hollis indicated that Plaintiff has had a mental disorder of at least two years' duration; a minimal increase in mental demands or change in her environment would likely cause Plaintiff to decompensate; and Plaintiff has had one or more years' inability to function outside a highly supportive living arrangement and continues to need such an arrangement.  (Tr. 657.)  When asked to further elaborate, Hollis declined to do so.  (Tr. 657.)  Plaintiff could manage benefits in her best interest.  (Tr. 657.)

Plaintiff had a session with Hollis on October 17.  (Tr. 659.)  Plaintiff reported "feel[ing] like something negative is coming" and "[h]ad some panic last week."  (Tr. 659.)  Hollis encouraged Plaintiff to meet with Lietzau every month.  (Tr. 659.)  Hollis also completed a medical information request form from Ramsey County.  (Tr. 661.)  On the form, Hollis checked "bipolar disorder" as Plaintiff's diagnosis and also listed panic disorder and PTSD.  (Tr. 661.)  Hollis indicated that these conditions are expected to last six months or more, indicating that Plaintiff may see improvement in one year.  (Tr. 661.)  Hollis indicated that Plaintiff is unable to work and would be unable to work until October 2012.  (Tr. 661.)  Hollis also checked a box stating that she "would support [Plaintiff] in applying for disability benefits."  (Tr. 661.)  When asked if Plaintiff needs someone in her home to care for her, Hollis checked "no."  (Tr. 661.)

**F.  2012**

The final notation in Plaintiff's medical record is from a January 30, 2012 session with Hollis.  (Tr. 663.)  Plaintiff reported being up at night and sleepwalking.  (Tr. 663.)  Hollis also noted that Plaintiff had four children at home, two of whom were in high school and their "grades [were] not so good."  (Tr. 663.)  Additionally, Plaintiff's ex-

partner appeared to be showing favoritism to youngest son.  (Tr. 663.)  Hollis encouraged

Plaintiff to maintain boundaries with her ex-partner.  (Tr. 663.)

## IV. SSI-RELATED EXAMINATIONS & ASSESSMENTS

### A.  SSI Interview & Plaintiff's 2009 Function Report

In an August 2009 interview in connection with her application for SSI benefits,

Plaintiff told the interviewer that she suffers from depression, generalized anxiety

disorder with social phobia, PTSD, and mild mental retardation.  (Tr. 144, 145.)  Plaintiff

reported that she "feel[s] sad a lot" and "tr[ies] to keep [her]self busy because otherwise

[her] mind [focuses] on negative things."  (Tr. 145.)  Plaintiff also reported feeling

nervous and worrying about those around her.  (Tr. 145.)  Plaintiff reported that she only

sleeps a few hours at a time and has a decreased appetite.  (Tr. 145.)  Plaintiff stated that

she had difficulty remembering things and needed "to write everything down."  (Tr. 145.)

Plaintiff reported that she was taking Abilify "for [her] psychotic behavior"; Ambien and

hydroxyzine[24] to help with her insomnia; and Paxil to treat her depression.  (Tr. 150.)

As far as how these conditions affected her ability to work, Plaintiff stated that she

"ha[s] trouble doing math"; difficulty remembering "how to complete tasks or what [she

is] supposed to be working on"; and difficulty "being around people," including an

inability to trust and take instruction from others.  (Tr. 145.)  Plaintiff stated that she last

worked in 2007 as a cook in a fast-food restaurant and stopped working "[b]ecause of

[her] condition."  (Tr. 145; *see also* Tr. 161-62.)

---

[24] Hydroxyzine "[t]reats anxiety, tension, nervousness, nausea, vomiting, allergies, skin rash, hives, and itching."
*Hydroxyzine*, PubMed Health, Nat'l Ctr. for Biotechnology Info.,
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0000905/ (last visited July 21, 2014).

Plaintiff also completed a function report.  (Tr. 153.)  In the report, Plaintiff stated that she has five children living at home.  (Tr. 154.)  Plaintiff's daily routine consisted of getting up, tidying her home, seeing her children off to school, performing her personal cares, taking her medication, and, if she does not have a medical appointment, "just sit[ting] and watch[ing] TV and possibly take a few naps."  (Tr. 153; *see also* Tr. 154.)  Plaintiff "might make a meal, otherwise the kids cook for themsel[ves].  Then it[']s bed time."  (Tr. 153.)  Plaintiff indicated that her children's father assists her in caring for the children, "com[ing] and tak[ing] them places, get[ting] things they need."  (Tr. 154.)  Additionally, Plaintiff's oldest daughter helps care for the younger children.  (Tr. 154.)

Plaintiff reported that her impairments prevent her from being as social and outgoing as she used to be whereas, in the past, she "could be with crowds of people."  (Tr. 154.)  Plaintiff finds it "hard to dress 'appropriately' for situations" and "might wear clothes twice a week."  (Tr. 154.)  Plaintiff also stated that she did not style her hair as often anymore.  (Tr. 154.)  Plaintiff reported that her children will help her fix her hair and remind her to change her clothes.  (Tr. 155.)  Plaintiff's sixteen-year-old daughter also helps Plaintiff remember to take her medication.  (Tr. 155.)

Plaintiff stated that she "do[es not] always eat three meals a day and choose[s] snack foods instead of real meals," but also indicated that she prepares her own meals, including "fried chicken, vegetables, [and] rice."  (Tr. 154, 155.)  Plaintiff reported preparing meals approximately twice per month and it usually takes her one hour.  (Tr. 155.)  Plaintiff indicated that she has lost interest in cooking as a result of her impairments and "[b]ig meals are too overwhelming."  (Tr. 155.)  As for household

chores, Plaintiff reported that she washes dishes, vacuums, and cleans her room "every day." (Tr. 155.) Plaintiff stated that her children also help with housekeeping. (Tr. 155.)

Plaintiff stated that she usually leaves the house only for medical appointments, which take place two to three days per week. (Tr. 156; *see also* Tr. 157.) Plaintiff explained that she "do[es not] like the crowds and people" and is "afraid things will get out of hand." (Tr. 156.) Plaintiff stated that she accepts rides from others, uses public transportation, and relies on medical transportation services in order to get around. (Tr. 156.) Plaintiff stated that she is "scared to drive" because she "do[es not] trust the other drivers" and "do[es not] have control [over] the situation." (Tr. 156.)

Plaintiff stated that she shops for "food, clothing, [and] household products" in stores, and reported going grocery shopping with her children and their father once per month. (Tr. 156; *see also* Tr. 157.) While Plaintiff is able to count change, handle a savings account, and use a checkbook, Plaintiff receives help from her daughter and her (Plaintiff's) children's father with tracking bills and paying them on time. (Tr. 156.) Due to her impairments, Plaintiff stated that her "daughters have taken over handling the money." (Tr. 157.)

As for her hobbies and interests, Plaintiff reported that she liked to read, swim, and walk, but no longer reads or swims as often due to her impairments and has difficulty "find[ing] the motivation to do these things." (Tr. 157.) Plaintiff stated that she finds reading "hard" because she has difficulty concentrating. (Tr. 157.)

As for social activities, Plaintiff does not spend time with others. (Tr. 157.) Plaintiff reported that she needs to be reminded to go places and, when she does go, she

"leave[s] when [she] need[s] to and [is] only 30% involved in what's happening around her." (Tr. 157.) Plaintiff stated that she has trouble interacting with others as she "take[s] offense to people looking at [her] wrong or how they speak to [her]" and "get[s] an attitude and pick[s] an argument." (Tr. 158.) Plaintiff "do[es not] like being around people [be]cause [she is] afraid something bad will happen." (Tr. 159.) Plaintiff stated that she "depend[s] on family to do the talking." (Tr. 157; *see also* Tr. 158.) Additionally, Plaintiff reported that she "really do[es not] like the police." (Tr. 159.)

In describing how her impairments limit her abilities, Plaintiff reported having difficulty with talking, remembering, completing tasks, concentrating, understanding, following instructions, and getting along with others. (Tr. 158.) Plaintiff described her memory as "terrible" and stated that she needs to write things down and have several reminders. (Tr. 158.) Plaintiff "start[s] things [that she] do[es not] finish." (Tr. 158.) Plaintiff stated that she finds it "hard to concentrate"; things need to be explained multiple times; and, while her attention span varies, it is usually "not that long." (Tr. 158.) Plaintiff also stated that she needs to read things several times and then ask questions in order to understand. (Tr. 158.) Plaintiff also reported difficulty handling stress, "isolate[ing her]self" as a result. (Tr. 159.) Similarly, Plaintiff stated that she does not handle changes in routine well, finding changes "irritating" and "hard." (Tr. 159.) In the space for additional notes, Plaintiff wrote that her "doctors are now saying [she] might have bi-polar and are thinking about changing [her] meds." (Tr. 160.)

63

### B. Rivera's 2009 Function Report

Plaintiff's daughter, Andrea Rivera, also completed a function report.  (Tr. 169-76.)  Rivera stated that she spends approximately seven hours with her mother every other day and they "usually just talk."  (Tr. 169.)  In describing her mother's daily activities, Rivera stated that her mother bathes, cleans, watches TV, and sometimes takes rides.  (Tr. 169.)  Rivera stated that she assists her mother in taking care of the children.  (Tr. 170.)  Rivera stated that her mother does not clean as much as she used to and now takes medication to help her sleep.  (Tr. 170.)

Rivera reported that her mother's impairments do not affect her personal care, but she sometimes needed reminders for medical appointments and to take (or not take additional) medication.  (Tr. 170, 171; *see also* Tr. 173.)  Rivera stated that her mother prepared simple foods and would generally prepare meals about three times per week, otherwise "the kids cook."  (Tr. 171.)  Rivera stated that her mother does not cook as often as she used to.  (Tr. 171.)  As for household tasks, Rivera reported that her mother cleaned, did the laundry, and ironed until the task was complete or "as much as she can."  (Tr. 171.)  Rivera stated that "the boys in the house" take care of yard work.  (Tr. 172.)

As for her mother's ability to get around, Rivera stated that Plaintiff walked, used public transportation, and relied on rides from others, noting that her mother was "afraid" to drive.  (Tr. 172.)  Rivera also reported that her mother shops for clothes, groceries, and household items in stores.  (Tr. 172.)  Rivera indicated that her mother could pay bills, count change, and use a checkbook, and that her mother's impairments had not changed her ability to handle money.  (Tr. 172, 173.)

Rivera reported that her mother enjoyed swimming, "when she can," and usually swam at the YWCA "about once [per] month." (Tr. 173.)  With respect to Plaintiff's social activities, Rivera stated that her mother spent time with others including walking around with Rivera's son and talking on the phone with her own mother. (Tr. 173.) Rivera stated that Plaintiff did these activities about every other day and regularly went to the store. (Tr. 173.)

As for Plaintiff's ability to get along with others, Rivera stated that Plaintiff "prefers to be [by] herself[, b]ut she[ is] nice when the kids have friends over." (Tr. 174.) Rivera stated that her mother "does[ not] like socializing with people [or] . . . being in big crowds." (Tr. 174.)  As for Plaintiff's ability to get along with authority figures, Rivera stated that Plaintiff "gets along well" with "landlords [and] teachers," "but not with the police." (Tr. 175.)

Rivera indicated that her mother had difficulty talking, remembering, completing tasks, concentrating, understanding, following instructions, and getting along with others as a result of her impairments. (Tr. 174.)  When asked about Plaintiff's ability to follow written and spoken instructions, however, Rivera stated that she "d[id not] know." (Tr. 174.)  Rivera stated that Plaintiff is able to finish what she starts. (Tr. 174.)  Rivera also indicated that her mother does not handle stress "well at all." (Tr. 175.)  Further, Rivera stated Plaintiff's ability to handle change depended upon the type of change. (Tr. 175.) Rivera reported that Plaintiff was able to handle "good" changes. (Tr. 175.)

### C.  Dr. Wiger's Psychological Consultative Exam

Plaintiff participated in a psychological consultative examination in connection with her disability application on January 25, 2010, which was conducted by Donald E. Wiger, Ph.D., L.P.  (Tr. 400, 404, 405.)  Dr. Wiger was asked to assess Plaintiff for depression, PTSD, mild mental retardation, and generalized anxiety disorder with social phobia. (Tr. 400.)

Plaintiff told Dr. Wiger that "she does not like being around other people" and "has a quick temper."  (Tr. 400.)  Plaintiff also "state[d] that she does not like taking orders from people or being told what to do." (Tr. 400.)  Dr. Wiger asked Plaintiff "what type of work she is able to do" and Plaintiff responded, "None."  (Tr. 400.)  Plaintiff told Dr. Wiger that she attended school until the 11th grade and then "quit because she did not like school."  (Tr. 400.)  Plaintiff reported that she last worked three years ago at a fast-food restaurant for one week and "left because she did not like the manager or her coworkers."  (Tr. 400.)

Dr. Wiger noted Plaintiff's current prescriptions of Vistaril, Paxil, divalproex sodium[25], and Ambien.  (Tr. 400.)  Plaintiff reported "that her medications are somewhat helpful."  (Tr. 400.)  Dr. Wiger reviewed records from

> Family Psychological Services in which [Plaintiff] stated that she is able to work, but has concerns with depression, anxiety[,] and [obsessive compulsive disorder].   WAIS-III results noted Verbal, 65, Performance, 70[,] and Full Scale IQ, 64.  WRAT-IV results were in the borderline range.  She

---

[25] "Divalproex sodium is . . . used to treat the manic phase of bipolar disorder (manic-depressive illness) . . . ." *Divalproex (By Mouth)*, PubMed Health, Nat'l Ctr. for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0009998/ (last visited July 2, 2014).

> was diagnosed with depression NOS, generalized anxiety
> disorder, PTSD[,] and mild [mental retardation].

(Tr. 400.)  Dr. Wiger also reviewed records from Associate Clinic of Psychology, which

"noted concerns with depression, low motivation, anxiety, isolation[,] and a few other

concerns that were not legible . . . . [Plaintiff] was diagnosed with bipolar II and PTSD

with a GAF of 41 and in another report she had a GAF of 45 to 50."  (Tr. 400-01.)

When describing her typical day, Plaintiff narrated a similar routine to that

described in her function report, including caring for her children, cleaning, and talking

with her mother on the phone.  (*Compare* Tr. 153 *with* Tr. 401.)  Additionally, Plaintiff

reported that "[s]he does not watch much television."  (Tr. 401.)  Plaintiff was, however,

"in touch with at least one current event" and "knew the names of 2 out of 3 of the most

recent presidents."  (Tr. 402.)  Plaintiff reported that "[s]he does chores.  She does not

have any friends.  She goes to church at times.  She states that she is usually at home.

When asked what she does, [Plaintiff] state[d] that she bathes twice [per] day and spends

much time thinking."  (Tr. 401.)  Plaintiff also stated that "[s]he does not drive."  (Tr.

401.)  Plaintiff reported that she has trouble sleeping.  (Tr. 401.)

Dr. Wiger observed that Plaintiff's "posture and grooming were within normal

limits" and "[s]he appeared to be in good health."  (Tr. 401.)  During the interview,

Plaintiff "related to [Dr. Wiger] in a matter[-]of[-]fact manner" and displayed "no

unusual gestures or mannerisms."  (Tr. 401.)  Plaintiff's "activity level was within normal

limits[; s]he was not limp, rigid, lethargic, combative, or hyperactive."  (Tr. 401.)

Plaintiff "did not appear to be preoccupied or easily distracted" and "sat still the entire

time." (Tr. 401.) Plaintiff "appeared to be relaxed and alert." (Tr. 401.) Plaintiff's "speech was clear and 100% understandable" and she displayed "normal volume, vocabulary, details, pronunciations, sentence structure, and reaction time." (Tr. 401.) Plaintiff had a "neutral affect" throughout the interview." (Tr. 401.)

Based on Plaintiff's reports of "a history of anger management problems," feelings of anxiety and irritation, and "muscle tension and sleep disturbance," Dr. Wiger opined that Plaintiff's "symptoms suggest a generalized anxiety disorder." (Tr. 401-02.) When asked about depression, Plaintiff reported having "negative thoughts, low self[-]esteem, difficulty sleeping, difficulty concentrating, low energy, and hopelessness." (Tr. 402.) Dr. Wiger opined that these symptoms "suggest[] dysthymic disorder." (Tr. 402.) Dr. Wiger opined that Plaintiff's reported symptoms of difficulties with trust, "believ[ing] that people have hidden meanings," "hold[ing] grudges," "perceive[ing] character attacks," and "being sexually suspicious of her partners[] suggest[] a paranoid personality disorder." (Tr. 402.)

Plaintiff also told Dr. Wiger "that she hears voices." (Tr. 402.) When Dr. Wiger inquired further, Plaintiff "state[d] that sometimes she hears her name being called, which does not take place very often." (Tr. 402.) Dr. Wiger opined that "there is not evidence of a psychotic disorder." (Tr. 402.) Dr. Wiger additionally noted that Plaintiff "was in touch with reality" and "held a brief, reactive conversation." (Tr. 402.)

Regarding Plaintiff's attention and concentration, Dr. Wiger observed that Plaintiff was able to count by 3s, but could not "count backward from 100 by 7[s]"; "correctly said the months of the year forward and backward"; correctly spelled the word

"world" forward and, with encouragement, backward; and "correctly multiplied 4x7, but not 7x8." (Tr. 402.) Dr. Wiger noted that Plaintiff "understood every question" and "was not fidgety." (Tr. 402.) Dr. Wiger opined that Plaintiff's "intellectual functioning and concentration appeared to be in the low-average range." (Tr. 402.)

Dr. Wiger tested Plaintiff's intelligence using the Wechsler Adult Intelligence Scale-IV (WAIS-IV). (Tr. 402, 403.) Plaintiff scored at or below the third percentile in verbal comprehension, perceptual reasoning, and working memory. (Tr. 403.) Plaintiff scored in the eighth percentile for processing speed. (Tr. 403.) Plaintiff's full-scale IQ score was 66, placing her at the first percentile. (Tr. 403.) In Dr. Wiger's opinion, Plaintiff's "scores are not a good indicator of [Plaintiff's] intellectual functioning . [Plaintiff's] overall conversation and demeanor suggested a higher intellectual functioning. She seemed anxious during the interview." (Tr. 403.)

As for Plaintiff's memory, she was able to "recall[] 3 of 3 words immediately and 1 out of 3 words after five and thirty minutes." (Tr. 402.) Plaintiff "remembered the faces [sic] of previous schools, recent meals[,] and recent events in her life. When [Dr. Wiger] asked [Plaintiff's] opinion of her memory, she stated 'It's really bad.'" (Tr. 402.) Dr. Wiger tested Plaintiff's memory using the Wechsler Memory Scale-IV (WMS-IV). (Tr. 403.) Plaintiff scored at or below in the first percentile in all memory indices. Similar to Plaintiff's WAIS-IV IQ score, Dr. Wiger found the resultant scores inconsistent with his observations during the interview. (Tr. 403.) Dr. Wiger opined "that the WAIS-IV and WMS-IV results are significantly lower that [Plaintiff's] true functioning." (Tr. 403.)

69

Ultimately, Dr. Wiger diagnosed Plaintiff with dysthymic disorder, generalized anxiety disorder with significant irritability, and paranoid personality disorder.  (Tr. 403.) Dr. Wiger gave Plaintiff a GAF score of 54.  (Tr. 404.)  Dr. Wiger opined that Plaintiff

> is able to understand directions.  She can carry out mental tasks with reasonable persistence and pace.  She relates poorly to other people. . . . [S]he would have many difficulties handling the stressors of the workplace due to social concerns.  However, she likely could perform tasks such as cleaning, assembly[,] or other task that do not require significant social interactions, depending on the position.

(Tr. 404.)  Plaintiff was able to handle her own funds.  (Tr. 404.)

### D.  Dr. Shields's Psychiatric Review Technique & Mental Residual Functional Capacity Assessment

On February 5, 2010, P.E. Shields, Ph.D., L.P., completed a psychiatric review technique.  (Tr. 419.)  Dr. Shields concluded that Plaintiff had the medically determinable impairments of dysthymic disorder and generalized anxiety disorder with significant irritability that did not meet the listings of 12.04 (affective disorders) and 12.06 (anxiety-related disorders), respectively.  (Tr. 422, 424.)  Dr. Shields opined that Plaintiff had mild limitations in her activities of daily living and moderate limitations in maintaining social functioning and concentration, persistence, or pace.  (Tr. 429.)  Dr. Shields also found there that had been no episodes of decompensation of extended duration and concluded that the "C" criteria of listings 12.04 and 12.06 had not been met.  (Tr. 429, 430.)

In addition to reciting portions of the medical record, Dr. Shields noted that there was "no mention in [Hollis's] therapy notes of any borderline intellectual functioning or organic cognitive defects."  (Tr. 431.)  Dr. Shields also noted that Plaintiff's "reported

functioning and other evidence suggest a higher level of functioning" than evidenced in the scores alone.  (Tr. 431; *see also* Tr. 435.)  Dr. Shields found Plaintiff to be "partially credible."  (Tr. 431; *see also* Tr. 435.)  Dr. Shields "concluded . . . that despite anxiety symptoms and other symptoms, [Plaintiff] is capable of at least brief and superficial contact with coworkers and supervisors."  (Tr. 431; *see also* Tr. 435.)

Dr. Shields also completed a mental residual functional capacity assessment.  (Tr. 433-35.)  Dr. Shields summarized his findings as follows: Plaintiff "retain[ed] sufficient mental capacity to concentrate on, understand, and remember routine repetitive instructions, but would be markedly impaired for detailed or complex/technical instructions"; was able "to carry out routine, repetitive tasks . . . , but markedly impaired for detailed and complex tasks"; could "handle brief, infrequent and superficial contact" with co-workers and the public; had a reduced ability to tolerate and respond appropriately to supervision but could "handle ordinary levels of supervision found in a customary work setting"; and had a reduced ability "to tolerate and respond appropriately to stress in the work place . . . but . . . [could] handle the routine stresses of a routine, repetitive work setting."  (Tr. 435.)

### E.  Appeals-Related Disability Reports & Assessment

Plaintiff completed another disability report in April 2010 in connection with her appeal.  (Tr. 180-87; *see* Tr. 192.)   Plaintiff indicated that she "has recently been diagnosed with bi-polar and Vitamin D deficiency."  (Tr. 181.)   In addition to her hydroxyzine and Paxil prescriptions, Plaintiff was taking divalproex sodium tabs, vitamin

D tablets, and zolpidem tartrate[26].   (Tr. 184.)  Plaintiff's abilities and activities were "the

same."  (Tr. 185.)

On reconsideration, R. Owen Nelsen, Ph.D., L.P., affirmed Dr. Shield's

assessment of Plaintiff's mental residual functional capacity, noting that

> [Plaintiff] []is able to have at least brief contact with people
> and does go to church.  On recon[sideration], [Plaintiff]
> performs [activities of daily living], interacts with family,
> appears to be stable[,] has three[-]month follow ups with
> doctor, no new medications, no worse[n]ing of conditions.
> [Plaintiff] s[ays] family is stressful[ ,] but is [able] to deal
> with it.

(Tr. 450.)

In December 2010, Plaintiff completed an additional disability report, indicating

that her "depression has gotten worse" and she "compulsively clean[s], both [her]self and

[her] house, at least three hours [per] day."  (Tr. 192.)  Plaintiff stated that she bathed "at

least three times [per] day as well."  (Tr. 192.)  Plaintiff described herself as "increasingly

anxious, forgetful, and irritable."   (Tr. 192.)   Plaintiff stated that she has increased

difficulty with concentration; is "very crabby"; and is "isolated, aside from doctors and

mental health professionals, [she] interact[s] only with [her] children."  (Tr. 192.)

In addition to her prescriptions for Ambien, divalproex, Paxil, and propranolol

(which Plaintiff now stated was being used to treat anxiety), Plaintiff was also taking

mirtazapine[27] for insomnia and back pain.  (Tr. 197.)

---

[26] Zolpidem is a drug used to treat insomnia.  *Zolpidem (By Mouth)*, PubMed Health, Nat'l Ctr. for Biotechnology
Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0001948/ (last visited July 2, 2014).  *See also supra* n. 3.
[27] Mirtazapine is typically used to treat depression.  *Mirtazapine (By mouth)*, PubMed Health, Nat'l Ctr. for
Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011242/ (last visited July 2, 2014).  *See
also supra* n. 22.

Further, Plaintiff also reported changes in her ability to care for her personal needs. (Tr. 198.) Plaintiff reported feeling unmotivated and spending a couple of days per week in bed; "bath[ing] and clean[ing] excessively"; and experiencing "significant concentration and memory impairments." (Tr. 198.)

## V. HEARING TESTIMONY & DECISION OF ALJ

### A. Hearing Testimony

At the hearing, Plaintiff testified that four of her seven children live with her at home. (Tr. 35.) Plaintiff testified that she dropped out of school after tenth grade because she "was having some issues with [her] life." (Tr. 36.) Plaintiff testified that she took "regular classes" when she was in school. (Tr. 36.) Plaintiff also testified that she is currently enrolled in courses to complete her GED, but does not feel like she is making progress as she has been enrolled for over one year "off and on" and has "trouble staying in the school every day." (Tr. 37, 40.) Plaintiff testified that she has trouble staying focused on her work. (Tr. 40.)

Plaintiff testified that she last worked in 2007 at a fast-food restaurant and then quit because she "did[ no]t really feel comfortable" and "kind of got into it with . . . a supervisor." (Tr. 37.) Plaintiff "did[ no]t really like [the supervisor's] attitude" and believed the supervisor was "being unfair" and "not treating [her] right." (Tr. 37, 38.) When asked why she did not pursue other employment after leaving the fast-food restaurant, Plaintiff responded, "[w]ell, between those years I[ ha]ve had children." (Tr. 50.) Plaintiff testified that she looked for work "years before" the fast-food position and "was never hired," but has not looked for work since then. (Tr. 50.)

73

Plaintiff was asked to describe her typical day. (Tr. 41.) After getting her kids ready for school, Plaintiff testified that she eats breakfast, if she has an appetite, and then she "may take a bath or shower [and] get ready for school." (Tr. 41.) Plaintiff takes a bus to school and her classes are from 9:15 a.m. to 12:15 p.m. (Tr. 41.) When she gets home from school, Plaintiff cleans, including washing, mopping, and doing laundry. (Tr. 41, 42.) Plaintiff's children will typically cook dinner and Plaintiff will eat if she has an appetite. (Tr. 42.) Plaintiff explained that she "believe[s her children] like to do [the cooking]." (Tr. 59.) In the evening, Plaintiff makes sure her children have done their homework and are ready for school the next day and then tries to be in bed by 8:00 or 9:00 p.m. (Tr. 42.) Plaintiff testified that she bathes up to three times per day and changes clothes approximately twice per day, but there are some days that she does not get dressed. (Tr. 42, 47.) The ALJ asked whether the children's father helps take care of them and Plaintiff testified that he comes over nearly every day. (Tr. 56, 57.) Plaintiff stated that the children's father and one of her daughters help transport the other children to their activities. (Tr. 57.)

When Plaintiff's attorney asked her about her cleaning habits, Plaintiff testified that she does laundry every day and will do a load of laundry "even if there[ i]s nothing to clean." (Tr. 42.) Plaintiff testified that that she will look in her closet and her children's closets in order to find something to wash. (Tr. 43.) Plaintiff also testified that she will still clean the house even if things are already clean. (Tr. 43.)

Plaintiff testified that her two oldest daughters take care of the grocery shopping because she gets irritated "picking out food and . . be[ing] in a grocery store." (Tr. 43.)

Plaintiff testified that her "older daughter and [her] 19-year-old" take care of paying the bills because Plaintiff "tend[s] to forget and [is] not good with money."  (Tr. 48.)  Plaintiff's older children also help her quite a bit around the house.  (Tr. 55.)  Additionally, Plaintiff testified that sometimes her daughter takes the bus with her because her daughter thinks that Plaintiff "should[ no]t be around out and about sometimes by [her]self" and is afraid that Plaintiff "might get into some stuff," such as "arguments with people."  (Tr. 44.)

Plaintiff testified that she thinks about her traumatic experiences on a daily basis.  (Tr. 45.)  She also testified that she has nightmares and typically gets up three to four times per night.  (Tr. 46.)  When the ALJ asked about the "unpleasant experiences . . . keeping [Plaintiff] up at night," Plaintiff told the ALJ that a teenage boy was shot leaving a party at her home.  (Tr. 54.)  Plaintiff testified that "[s]ometimes" she cries "on a daily basis."  (Tr. 48.)

As for her social activities, Plaintiff testified that she does not have any friends and talks with family on the telephone.  (Tr. 46.)  Plaintiff testified that she "do[es no]t like being in groups."  (Tr. 46.)  Plaintiff also testified that she does not attend religious services, watch T.V., or use a computer.  (Tr. 43.)

Before she became disabled, Plaintiff testified that she enjoyed swimming and going to the gym and used to participate in her children's afterschool programs.  (Tr. 46.)  Plaintiff no longer attends her son's athletic events because "[a] lot of times [she is] irritated and [does not] want to get anywhere and start anything to make [her] son embarrassed or anything so [she does not] go."  (Tr. 47.)  Plaintiff testified that she also

75

used to read, but does not do so any longer.  (Tr. 43.)  The ALJ asked whether Plaintiff still attended "the YMCA."  (Tr. 54.)  Plaintiff testified that she has not been in probably two years, stating she "just started isolating [her]self more."  (Tr. 54.)  When asked why, Plaintiff responded that she "do[es no]t really know why."  (Tr. 54.)

The ALJ asked Plaintiff to explain why she did not attend her son's athletic events and what she would "get irritated about."  (Tr. 54.)   Plaintiff stated, "It[ i]s just some of the people I might not like or somebody might scream something out in the crowd that I might get upset about.  Something stupid but to me it might mean something  to me." (Tr. 55.)  Such remarks might lead to an argument and Plaintiff did not want to embarrass her son.  (Tr. 55.)  The ALJ explained that he was trying to understand how Plaintiff's situation is "more significant than what a normal person would deal with when they[ a]re irritated based upon somebody saying something that you think is just unfair.  I mean, I guess we all get into arguments when we do[ no]t like what we hear sometimes." Plaintiff responded that she did not think that everyone gets into an argument and, for her, "just the littlest thing might just set [her] off."  (Tr. 55.)

In addition, Plaintiff testified that she forgets things "a lot."  (Tr. 47.)  Plaintiff testified that she has trouble remembering to take her medications and has someone remind her.  (Tr. 47.)  Plaintiff also testified that she does not remember appointments well either.  (Tr. 48.)  On the weekend, Plaintiff will receive a phone call from the clinic reminding her of an appointment.  (Tr. 48.)  Plaintiff testified that she uses "a medical ride" to get to her appointments.  (Tr. 48.)

When asked how she spends her free time, Plaintiff testified that she listens to music.  (Tr. 41, 56.)  Plaintiff testified that she did not get out of the house much but, if she were to get out and exercise, there is a lake near her home so she might walk around the lake with her youngest daughter.  (Tr. 56.)

With respect to her mental health treatment, Plaintiff stated that she was supposed to see Hollis every three weeks and did not participate in "group therapy."  (Tr. 51.)  Plaintiff also testified that she did not think that her medications were helping her.  (Tr. 53.)  The ALJ asked if Plaintiff had discussed this with her doctor so that adjustments could be made and Plaintiff responded that she had and the doctors wanted her to try the medication a little bit longer before adjusting it.  (Tr. 53.)

Plaintiff's counsel asked Plaintiff a few questions about Plaintiff's nightmares and her suicide attempt earlier in the year.  (Tr. 57, 58.)  Plaintiff responded "yes" when asked if she had a history of abuse.  (Tr. 57.)  Plaintiff explained that she overdosed on Xanax in an attempt to kill herself.  (Tr. 58.)  Plaintiff testified that she was hospitalized for a period of time and then participated in a partial hospitalization program.  (Tr. 58.)  Plaintiff testified that group therapy was recommended when she was discharged from the partial hospitalization program, but she did not follow up with this recommendation.  (Tr. 58-89.)  Plaintiff stated that she "fe[lt] really uncomfortable in a group setting . . . when I attended their group meetings."  (Tr. 59.)

The ALJ asked the vocational expert to assume a person of Plaintiff's age, education, and work experience with no exertional limitations and the following non-exertional limitations: "The person would be capable of work in a low stress job defined

as having only occasional changes in the work setting.  The person would be capable of only occasional interaction with the public and only occasional interaction with co-workers." (Tr. 61.)  The vocational expert testified that such a person could work as a "stubber" in retail, placing tags on items, which is generally performed in a back room. (Tr. 61, 62.)  The vocational expert also testified that such a person could clean lab equipment and work as a hand packager.  (Tr. 62.)  The ALJ asked what type of rest breaks would be associated with this type of unskilled work and the vocational expert testified that there would generally be "a half hour lunch break and two 10 or 15 minute breaks[,] one in the morning and one in the afternoon." (Tr. 62.)  If someone were to "continually exceed those number of breaks," the vocational expert testified that such a person would likely be unemployable.  (Tr. 62.)

The ALJ next asked if the vocational expert's testimony would change if the restriction of only having occasional contact with a supervisor was also included.  (Tr. 62.)  The vocational expert testified that it would not as "[n]one of these positions are positions where a supervisor would be standing over an individual at all times.  There would be interaction but . . . not more than occasional." (Tr. 62-63.)

As for absences from work, the vocational expert testified that one absence per month would be tolerated, three would result in termination, and two would be "iffy." (Tr. 63.)  The vocational expert testified that a person who needed to miss more than three days of work in a one-month period would be unemployable.  (Tr. 63.)  As for the concentration required, the vocational expert testified that "a person would need to

maintain concentration, consistence and pace for at least two consecutive hours at a time in order to maintain employment." (Tr. 64.)

Finally, when given an opportunity to add anything else, Plaintiff's counsel asked Plaintiff to describe how she has slept the last few days to the ALJ. (Tr. 64.) Plaintiff responded that she sleeps poorly three days per week, "tossing and turning all night long." (Tr. 64.) When asked if this happens often, Plaintiff testified, "Yeah, it kind of happens frequently. It depends on a lot of reasons. It could have been for the reason for today." (Tr. 65.) The ALJ clarified if Plaintiff was anxious regarding the hearing, and Plaintiff said, "Yeah." (Tr. 65.)

## B. Decision of the ALJ

The ALJ found and concluded that Plaintiff has not engaged in substantial gainful activity since July 24, 2009; Plaintiff has the severe mental impairments of PTSD, bipolar disorder, generalized anxiety disorder, and dysthymic disorder; and these impairments when considered individually or in combination, do not meet or medically equal one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1. (Tr. 12-14.) The ALJ found that Plaintiff had the residual functional capacity to perform work at all exertional levels, but with the following nonexertional limitations:

> Plaintiff is capable of work limited to the performance of simple routine and repetitive tasks. [Plaintiff] would be capable of working in a low stress job, which is defined as having only occasional changes in the work setting. [Plaintiff] would be capable of only occasional interaction with the public and coworkers.

(Tr. 16.)  Considering Plaintiff's age, education, work experience, and residual functional capacity, the ALJ concluded that a significant number of jobs exist in the national economy that Plaintiff could perform and, therefore, Plaintiff has not been under a disability, as defined in the Social Security Act, through February 29, 2012.  (Tr. 21-22.)

In reaching his decision, the ALJ observed that "there were several records indicating that [Plaintiff] had reduced intellectual functioning," citing Dr. Hoschouer's evaluation and conclusion that Plaintiff "had mild mental retardation with a full-scale intelligence quotient of [64], and that she had extremely low general adaptive skills." (Tr. 12.)   The ALJ contrasted Dr. Hoschouer's evaluation with Dr. Wiger's and his observation that Plaintiff's intelligence was higher than that indicated by her test scores. (Tr. 12.)  The ALJ also noted that "[s]tate agency doctors evaluated [Plaintiff] on several occasions and did not indicate . . . any ongoing intellectual deficit."  (Tr. 12.)  The ALJ also found Dr. Hoschouer's evaluation contradicted by his own notes which indicated that Plaintiff "was able to perform a wide range of adaptive functions including caring full time for multiple children.  His notes also indicate that [Plaintiff] enjoyed reading, was able to cook meals, perform household chores, shop in the community, watch [T.V.], and assist her children with their schoolwork."  (Tr. 12-13.)

Additionally, despite Dr. Hoschouer's finding of "significant cognitive impairment," the ALJ noted that Plaintiff's treatment records did not evidence a concern over her cognitive function.  (Tr. 13.)  "[I]f [Plaintiff] was truly very low functioning and was a vulnerable adult, [the ALJ would have expected] that other medical providers would have also raised questions regarding her cognitive and intellectual abilities."  (Tr.

13.)  The ALJ also found Plaintiff's testimony at the hearing "refuted any conclusion that

[Plaintiff] had a severe cognitive impairment or reduced intelligence."  (Tr. 13.)  The ALJ

determined that "there was no evidentiary basis to conclude that [Plaintiff] had a severe

intelligence or cognitive impairment."  (Tr. 13.)  The ALJ noted, however, that despite

this determination, he "consider[ed] all of [Plaintiff's] mental symptoms and limitations,

regardless of the cause," and, "[a]s such, the determination that [Plaintiff] d[oes] not have

a severe cognitive or intelligence-related impairment has no bearing on the outcome of

this decision."  (Tr. 13.)

In analyzing whether Plaintiff met listings 12.04 (affective disorders) and 12.06

(anxiety related disorders), the ALJ noted with respect to the "paragraph B" criteria that

Plaintiff had mild restrictions in her activities of daily living; moderate difficulties in

social functioning and maintaining concentration, persistence, or pace; and experienced

no episodes of decompensation of an extended duration.  (Tr. 15.)  The AJL further noted

> that [Plaintiff] did not experience any decompensation as
> defined in the listings.  On February 27, 2011, [Plaintiff]
> overdosed on Xanax and was put on a psychiatric hold until
> March 2, 2011.  Treatment notes during the hold period
> indicated that [Plaintiff] did not have a true desire to end her
> life and that she was reacting to a stressful family situation
> that had taken place the day prior.  Further, she remained
> hospitalized for only a few days after the incident occurred.
> While she did enter a partial hospitalization program after
> doctors discharged [her] from the hospital, her treatment
> notes from this period did not indicate that she remained
> decompensated for the requi[si]te amount of time.

(Tr. 15.)

81

The ALJ also considered the "paragraph C" criteria. (Tr. 15.) The ALJ found no evidence of decompensation or of a condition such "that even a minimal increase in mental demands or change in environment could cause [Plaintiff] to decompensate." (Tr. 15.) The ALJ also found no evidence that Plaintiff "required a supportive living arrangement" or "was unable to function outside of her home." (Tr. 15.)

The ALJ concluded that "outside of a few stressful situations, [Plaintiff] retained significant functional capacity." (Tr. 16.) The ALJ noted that Plaintiff had a history of PTSD and depression "stemm[ing] from two incidents where friends and family had been shot," but that medication helped control Plaintiff's symptoms. (Tr. 16, 17.) The ALJ observed that a May 2009 psychiatric evaluation showed that Plaintiff

> had [PTSD] and bipolar disorder, would need at least twelve months of therapy, and assigned her a [GAF] score of [41]. Follow-up treatment records indicated that [Plaintiff] would sometimes forget to complete tasks but did not have problems remembering other things, and indicated that she continued to experience depression in spite of treatment. However, by April of 2010, treatment notes indicated that [Plaintiff] was stable except when she was dealing with situational socioeconomic and family stress and that her [GAF] was [60] to [65]. The treatment notes also indicated that [Plaintiff] was not taking her medications as recommended by her mental health providers. A note from July of 2010 again noted that she had bipolar disorder and that her [GAF] score was between [55] and [60].

(Tr. 17 (citations omitted).)

The ALJ noted that Plaintiff remained "relatively stable through the summer of 2010" until October when she began experiencing financial and relationship difficulties. (Tr. 17.) The ALJ noted that Plaintiff's mental-health providers responded by increasing

her medication and recommending additional counseling.  (Tr. 17.)  During this time, Plaintiff's GAF score was 41.  (Tr. 17.)  While there was an additional period of apparent stabilization, the ALJ noted Plaintiff's suicide attempt in February 2011 after receiving news that her son's ex-girlfriend was pregnant by Plaintiff's ex-partner.  (Tr. 17.)  The ALJ observed, however, that "after a few days in the hospital receiving proper mental health treatment, doctors discharged [Plaintiff] and stated that she had a [GAF] score of [55]."  (Tr. 17.)  The ALJ noted that Plaintiff participated in a partial hospitalization program and was discharged with instructions to "continue medication management and therapy sessions, as well as address her legal and child support issues to help relieve some of her stress."  (Tr. 17 (citations omitted).)

Observing that Plaintiff's "treatment record showed a history of conservative treatment," the ALJ stated that her treatment "providers repeatedly noted that [Plaintiff] retained considerable functional capacity and that her impairments were mild to moderate in severity" when she was taking her medication and "not experiencing significant situational stressors."  (Tr. 17.)  The ALJ was "cognizant of the two episodes where her records showed that her mental health symptoms were significantly more limiting, but noted that these types of extreme situational stress would likely cause most people to have significantly reduced mental health functioning for a short period."  (Tr. 17.)  The ALJ concluded that, overall, the record showed that Plaintiff's "mental health impairments caused at most mild to moderate functional limitations."  (Tr. 17.)

The ALJ credited the opinions of state agency Drs. Shields and Nelsen "because [Plaintiff's] generally conservative treatment history did not suggest additional

limitations and her statements and testimony indicated she retained at least this level of functioning." (Tr. 18.) The ALJ also emphasized Drs. Shields and Nelsen's ability "to review [Plaintiff's] longitudinal treatment record" and the "range of treatment records" as well as their expertise in the field. (Tr. 18.)

The ALJ determined that Dr. Hoschouer's conclusion of "mild mental retardation" was not credible. (Tr. 18.) The ALJ pointed to the fact that "[s]tate agency doctors rejected [Dr. Hoschouer's] diagnostic and functional conclusions, [Dr. Hoschouer's] statements were not validated or consistent with [Plaintiff's] treatment records, and [Plaintiff's] own statements and testimony contradicted [Dr. Hoschouer's] conclusions." (Tr. 18.) The ALJ also noted that "Dr. Hoschouer appeared to rely on [Plaintiff's] own statements regarding her functioning . . . which were not entirely credible" and "there was no evidence that [Plaintiff] ever requested, received, or required [the ongoing case management support and adult rehabilitative support] services" recommended by Dr. Hoschouer. (Tr. 18.)

With respect to Hollis, the ALJ first found that her October 2011 opinion that Plaintiff could not work was not credible because "Hollis did not provide any reasoning for her conclusion that [Plaintiff] could not work and this form was completed at the request of Ramsey County, which may have different standards of disability than the Social Security Administration." (Tr. 18.) The ALJ then considered the mental health impairment questionnaire that Hollis completed around the same time frame. (Tr. 18, 19.) The ALJ noted an inconsistency between Hollis's indication on the questionnaire that even a minimal increase in mental demands would cause Plaintiff to decompensate,

whereas on the employment form, Hollis "stated that she did not think it was likely [Plaintiff] would have future mental health episodes that would require inpatient or residential treatment." (Tr. 19.)  Additionally, the ALJ found there was no evidence in the record to support Hollis's statement that Plaintiff "had one or more years' inability to function outside a highly supportive living arrangement." (Tr. 19.)

Moreover, the ALJ found that Plaintiff's "treatment records do not support [Hollis's] conclusion that [Plaintiff] had severe mental health limitations in almost every functional domain.  Outside of the isolated incidents where she reacted poorly to extremely stressful situations, [Plaintiff] received generally conservative treatment." (Tr. 19.) The ALJ also found that Plaintiff's "own statements and testimony . . . showed that she retained a considerable amount of adaptive functioning that calls into question whether she truly has 'poor or none' functioning in most functional domains." (Tr. 19.) Lastly, the ALJ found that "other credible medical opinion evidence did not validate [Hollis's] conclusions, instead noting that [Plaintiff] retained considerably more functional capacity." (Tr. 19.)

The ALJ also found that Plaintiff was "less than fully credible." (Tr. 19.)  The ALJ first reemphasized Plaintiff's history of "conservative treatment" and that Plaintiff "retained a considerable amount of functional capacity" when compliant with her medication and not experiencing situational stress.  (Tr. 19.)  Second, Plaintiff's allegations of significant limitations were not supported by medical opinion evidence. (Tr. 19.)  Third, Plaintiff's own

statements and testimony indicated that she retained the ability to engage in a wide range of activities of daily living and that she retained significant adaptive functional capacity. Specifically, on an average day, she stated that she wakes up early in the morning and makes sure that her four children make it to school on time, ensures that they complete their homework, cleans the house, and manages to get herself to her general education prep classes each day. Further, while she initially testified that she did not cook, later questioning revealed that she did not cook because her oldest daughter liked to cook. She also testified that she would sleep from eight to nine hours per night and was able to remember a number of tasks associated with caring for her children. These statements refute her own allegations that she only got two or three hours of sleep per night and that she had significant and profound memory impairments.

(Tr. 19-20.)

The ALJ also concluded that Plaintiff was not "as profoundly limited as she alleged." (Tr. 20.) The ALJ found that Plaintiff was only able to articulate one traumatic event—the party shooting—until prompted by her attorney when she recalled another. (Tr. 20.) The ALJ also found that Plaintiff's irritability was not as severe as she claimed. (Tr. 20.) The ALJ noted that Plaintiff no longer attended "her children's sporting events for fear of embarrassing her children if she got into an argument with others," but when asked for other examples, "the examples [Plaintiff] provided were examples of things that would irritate most people." (Tr. 20.) The ALJ further noted that Plaintiff's pursuit of her GED "appears at odds with her allegation of significant problems concentrating and focusing." (Tr. 20.) Lastly—and according to the ALJ, "perhaps most importantly"— when asked why Plaintiff was unable to work, Plaintiff "responded . . . by stating that she had children and the children's father was not always around to help." (Tr. 20.)

86

Finally, the ALJ found the statements of Rivera, Plaintiff's daughter, to be "generally credible" and such statements "support[ed] the functional conclusion in the residual functional capacity statement." (Tr. 20.) The ALJ noted that Plaintiff's daughter reported that Plaintiff was "able to engage in a wide range of tasks and activities," including make meals, do chores, shop, and engage in hobbies, and could be social with others. (Tr. 20.) Additionally, the ALJ took into account the statements of Plaintiff's daughter regarding Plaintiff's ability to get along with authority figures and difficulty with stress. (Tr. 20.)

## VI. ANALYSIS

This Court reviews whether the ALJ's decision is supported by substantial evidence in the record as a whole. *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011). "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." *Id.* This standard requires the Court to "consider both evidence that detracts from the [ALJ's] decision and evidence that supports it." *Id.* The ALJ's decision "will not [be] reverse[d] simply because some evidence supports a conclusion other than that reached by the ALJ." *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012). "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Id.* (quotation omitted).

Disability benefits are available to individuals who are determined to be under a disability. *See* 42 U.S.C. § 1381a; *see also* 20 C.F.R. § 416.901. An individual is

considered to be disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see also* 20 C.F.R. § 416.905(a). This standard is met when a severe physical or mental impairment, or impairments, renders the individual unable to do her previous work or "any other kind of substantial gainful work which exists in the national economy" when taking into account her age, education, and work experience. 42 U.S.C. § 1382c(a)(3)(B); *see also* 20 C.F.R. § 416.905(a).

Disability is determined according to a five-step, sequential evaluation process. 20 C.F.R. § 416.920(a)(4).

> To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010); *see also* 20 C.F.R. § 416.920(a)(4). In general, the burden of proving the existence of disability lies with the claimant. 20 C.F.R. § 416.912(a).

Plaintiff assigns numerous factual errors and raises several challenges to the ALJ's decision, contending that the decision is not supported by substantial evidence in the record as a whole. While acquiescing to some of Plaintiff's points, the Commissioner asserts that the ALJ's decision is supported by substantial evidence in the record as

whole.  Given the sequential nature of the disability evaluation process, the Court will endeavor to frame and address Plaintiff's arguments at each relevant step.  *See* 20 C.F.R. § 416.920(a)(4).

### A.  Meets or Equals a Listed Impairment

Plaintiff's predominant argument is that the ALJ erred by not concluding that she met or equaled a listed impairment at step three.  (Pl.'s Mem. in Supp. at 32-34, ECF No. 10.)  Related to this argument is Plaintiff's contention that the following factual findings by the ALJ are not supported by the record: Plaintiff did not have a severe cognitive impairment; Plaintiff's mental health treatment was "conservative"; Plaintiff's mental health was relatively stable and only occasionally disrupted; Plaintiff did not have PTSD because Plaintiff experienced only one traumatic event; and Plaintiff's suicide attempt was not "authentic."  (*Id.* at 15-22, 22-24.)

Plaintiff asserts that her severe impairments meet or equal listings 12.04 (affective disorders) and 12.06 (anxiety related disorders).  (*See* Pl.'s Mem. in Supp. at 2, 32-34; Pl.'s Reply at 9-11, ECF. No. 17.)  The requisite level of severity is met for listing 12.04 when either the A and B criteria are met or the C criteria are met, and for listing 12.06 when the A and B or A and C criteria are met.  20 C.F.R. pt. 404, subpt. P, app. 1, §§ 12.04, 12.06.

The parties dispute only the existence of the B and C criteria.  The ALJ found that Plaintiff had the severe impairments of PTSD, bipolar disorder, generalized anxiety disorder, and dysthymic disorder.  Despite the ALJ's determination that Plaintiff's PTSD was a severe impairment, however, Plaintiff argues that the ALJ "reject[ed Plaintiff's]

PTSD claim because he determined that she could articulate only one traumatic event."
(Pl.'s Mem. in Supp. at 22.)  The issue is not whether Plaintiff has PTSD, but whether
Plaintiff's PTSD, singly or in combination with Plaintiff's other severe impairments, met
or equaled one of the listings.  *See* 20 C.F.R. § 416.920(a)(4)(iii); *Hill v. Colvin*, 753 F.3d
798, 800 (8th Cir. 2014) (requiring the ALJ to evaluate whether the [severe] impairment
is or approximates an impairment listed in Appendix 1" at the third step of the evaluation
process).  Plaintiff's contention that the ALJ rejected her PTSD claim is without merit.

Similarly, Plaintiff asserts that the ALJ erred by concluding that Plaintiff did not
have a severe cognitive impairment.  (Pl.'s Mem. in Supp. at 15-18.)  Plaintiff does not
contend, however, that she meets or equals listing 12.05 (mental retardation), a listing
specifically considered by the ALJ.  Further, Plaintiff does not explain what effect a
finding that Plaintiff had a severe intelligence or cognitive impairment would have on her
ability to meet or equal listings 12.04 and 12.06—the listings whose criteria she contends
that she meets.  A determination of disability does not automatically result from the
finding of a severe impairment.  *See* 20 C.F.R. § 416.920(a)(4)(ii), (iii); *Hill*, 753 F.3d at
800; *accord Lund v. Colvin*, No. 13-cv-113 (JSM), 2014 WL 1153508, at *27 n. 33 (D.
Minn. Mar. 21, 2014).

Moreover, despite the absence of any "evidentiary basis to conclude that the
claimant had a severe intelligence or cognitive impairment," the ALJ considered "all of
[Plaintiff's] mental symptoms and limitations, regardless of cause," in his analysis.  (Tr.
13.)  Plaintiff contends that "[her] treating records are replete with references to memory
and concentration problems and other cognitive limitations."  (Pl.'s Mem. in Supp. at 17-

18.)   The ALJ's residual functional capacity accounts for these limitations by limiting Plaintiff to "simple routine and repetitive tasks" and a work environment where there are "only occasional changes in the work setting."  (Tr. 16.)  "[T]he failure to find additional impairments at Step Two does not constitute reversible error when an ALJ considers all of   a claimant's impairments in the remaining steps of a disability determination." *Johnson v. Comm'r of Soc. Security*, No. 11-cv-1268 (JRT/SER), 2012 WL 4328413, at *21 (D. Minn. July 11, 2012), *adopting report and recommendation*, 2012 WL 4328389 (D. Minn. Sept. 20, 2012); *accord Lund*, 2014 WL 1153508, at *27; *Bondurant v. Astrue*, 09-cv-328 (ADM/AJB), 2010 WL 889932, at *2 (D. Minn. Mar. 8, 2010).  Absent some explanation by Plaintiff as to how the finding of a severe cognitive impairment would impact the ALJ's ultimate conclusion regarding the absence of disability and the ALJ's express inclusion of Plaintiff's mental symptoms and limitations in subsequent steps of the evaluation process, any error by the ALJ in concluding that Plaintiff did not have a severe cognitive impairment—and the Court expresses no opinion on whether such an error was made—is harmless.

Accordingly, the Court now proceeds to consider whether the relevant B and C criteria have been met.

### 1.  B Criteria

Listings 12.04 and 12.06 require *at least two* of the following to satisfy the B criteria:

1.  Marked restriction of activities of daily living; or
2.  Marked difficulties in maintain social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

*Id.* § 12.04(B); *see also id.* § 12.06(B). Plaintiff does not contend that she has either marked restrictions of activities of daily living or repeated episodes of decompensation. Accordingly, Plaintiff must show that she has marked difficulties in *both* social functioning and maintaining concentration, persistence, or pace to meet the B criteria.

### a. Social Functioning

"Social functioning refers to [a person's] capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(2). A person "may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships or social isolation." *Id.* Conversely, a person "may demonstrate strength in social functioning by such things as [an] ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities." *Id.* A "marked" limitation is one that is "more than moderate but less than extreme" and "may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis." *Id.* § 12.00(C). With respect to social functioning, "marked" is not defined "by a specific number of different behaviors in which social

functioning is impaired, but by the nature and overall degree of interference with function." *Id.* § 12.00(C)(2).

The ALJ found that Plaintiff had "moderate difficulties" with respect to social functioning.  (Tr. 15.)  Plaintiff argues this conclusion is not supported by substantial evidence in the record as a whole.  (Pl.'s Mem. in Supp. at 32; *see also* Pl.'s Reply at 9-10.)  The Commissioner responds that the ALJ properly concluded that Plaintiff had only moderate difficulties in social functioning.  (Comm'r's Mem. in Supp. at 22-23, ECF No. 16.)  The Commissioner also cites Dr. Shield's "opin[ion] that Plaintiff experienced only moderate restrictions in social functioning."  (*Id.* at 24.)

The parties each provide lengthy citations to the record in support of their positions regarding Plaintiff's social functioning.  Indeed, there are several instances in which Plaintiff reports that she does not like to be around other people, has no friends, is irritable, tends to keep to herself, and does not want to participate in activities.  But there are also many instances in the record where Plaintiff is observed by medical providers to be in no distress, comfortable, and pleasant.  Collectively, Plaintiff was seeing these providers with greater frequency than her mental-health providers, often several times within a single month.  Additionally, Plaintiff was generally observed to have appropriate eye contact and speech.  The record also shows Plaintiff maintaining relationships with her family, significant other, and children despite the sometimes dysfunctional nature of those relationships.  Further, there is evidence in the record of Plaintiff engaging in social activities, such as shopping, using public transportation, attending therapy groups, and participating in a GED program.  Plaintiff also expressed interest in becoming a member

of her local YMCA/YWCA and, for at least a period of time, had a membership and used the facilities.  Plaintiff's treatment providers encouraged her to become more actively involved.  Finally, Drs. Shields and Nelsen both opined that Plaintiff had only moderate restrictions in social functioning.  As "experts in Social Security disability evaluation," the ALJ was required to consider their opinions in assessing Plaintiff's social functioning. 20 C.F.R. § 416.927(e)(2)(i).

In determining whether the ALJ's decision is supported by substantial evidence, the Court is to consider the entire administrative record, but not reweigh the evidence. *Byes v. Astrue*, 687 F.3d 913, 915 (8th Cir. 2012).  The ALJ's conclusion that Plaintiff is moderately impaired in her social functioning reflects the general difficulties Plaintiff experienced when interacting with others but at the same time recognizes Plaintiff's ability to respond appropriately and effectively during brief interactions.  *See Anderson v. Astrue*, No. 06-cv-4270 (ADM/FLN), 2008 WL 542599, at *19 (D. Minn. Jan. 8, 2008) ("attend[ing] many doctor appointments, individual and group therapy, and frequently spen[ding] time with her family" supports a finding of moderate limitations in social functioning); *accord Chong Vang v. Colvin*, No. 11-cv-3351 (PJS/JSM), 934 F. Supp.2d 1054, 1088 (D. Minn. 2013).  Although some evidence in the record *could* support a different conclusion, there is substantial evidence in the record as a whole to support the ALJ's conclusion.  *See Perks*, 687 F.3d at 1091.

### b.  Concentration, Persistence & Pace

"Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate

completion of tasks commonly found in work settings." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(3). "[M]ajor limitations in this area can often be assessed through clinical examination or psychological testing. Whenever possible, however, a mental status examination or psychological testing data should be supplemented by other available evidence." *Id.* Concentration can be assessed by having a person "subtract serial sevens or serial threes from 100" and by "tasks requiring short-term memory or through tasks that must be completed within established time limits." *Id.* A person "may be able to sustain attention and persist at simple tasks but may still have difficulty with complicated tasks." *Id.* Similar to social functioning, a "marked" limitation in this area is not defined "by a specific number of tasks that [a person] is unable to complete, but the nature and overall degree of interference with function." *Id.*

The ALJ concluded that Plaintiff had "moderate difficulties" maintaining concentration, persistence, or pace. (Tr. 15.) Plaintiff argues that (1) the record is replete with evidence demonstrating Plaintiff's memory difficulties, and (2) Plaintiff's obsessive thinking, "attention deficits, circumstantial thoughts, depression, lack of energy and motivation, fatigue, lack of interest, and severe anxiety . . . can and do have a significant impact on [Plaintiff's] ability to maintain concentration, persistence or pace." (Pl.'s Mem. in Supp. at 33; *see also* Pl.'s Reply at 10.) The Commissioner responds that the ALJ properly concluded that Plaintiff had only a moderate limitation in this area, noting that Plaintiff "received GAF scores of up to 65, indicating only mild psychological symptoms," and Plaintiff's participation in a GED program. (Comm'r's Mem. in Supp. at 24.) The Commissioner also asserts that Plaintiff's treatment providers noted multiple

instances in which Plaintiff's memory was either not impaired or only modestly impaired, she had normal thought processes, and was oriented. (*Id.* at 24-25.) Further, the Commissioner points to several tasks completed by Plaintiff evidencing the capacity of Plaintiff's memory. (*Id.* at 25.) The Commissioner also points to Dr. Wiger's opinion that Plaintiff "was able to understand directions and carry out mental tasks with reasonable persistence and pace" and Dr. Shields's opinion that Plaintiff "only had moderate difficulties in maintaining concentration, persistence, and pace." (*Id.* at 25-26 (quotations omitted).)

At numerous times, Plaintiff reported having difficulty with her memory, including remembering to take her medication and attend appointments. Plaintiff also reported, and treatment providers documented, impaired thought processes and concentration. Nevertheless, there were also times at which Plaintiff's treatment providers observed her to have normal or slightly impaired memory and normal thought processes, observing Plaintiff to be oriented and able to concentrate. The record shows that Plaintiff performs a variety of tasks on any given day, including caring for at least four children, performing her personal cares, cleaning, talking with her mother on the phone, using public transportation, attending medical appointments, and, more recently, attempting classes to complete her GED. Dr. Wiger opined that Plaintiff "can carry out mental tasks with reasonable persistence and pace," (Tr. 404), and Dr. Nelsen opined that Plaintiff was only moderately impaired in her ability to maintain concentration, persistence, and pace (Tr. 429). It was the duty of the ALJ to resolve this conflicting evidence. In light of the deferential standard of review and the evidence before the ALJ,

this Court cannot conclude that the ALJ erred in determining that Plaintiff was not markedly limited in her ability to maintain concentration, persistence, and pace.

Based on the foregoing, there is substantial evidence in the record to support the ALJ's determination that Plaintiff did not meet the B criteria.

### 2.  C Criteria

The C criteria for listings 12.04 and 12.06 are not the same.  *Compare* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04(C)(1)-(3) *with* § 12.06(C).  Plaintiff argues that evidence in the record shows that "even a minimal increase in mental demands or change in environment would likely cause [her] to decompensate" and she lives in a highly supportive living arrangement.  (Pl.'s Mem. in Supp. at 33-34; *see* Pl.'s Reply at 11.) These arguments most closely approximate the C criteria for listing 12.04: "A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate," or "Current history of 1 or more years' inability to function outside of a highly supportive living arrangement, with an indication of continued need for such arrangement."[28]  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04(C)(2), (3).

### a.  Minimal Increase in Mental Demands or Change in Environment to Cause Decompensation

Plaintiff cites a form in which Hollis checked a box that "[e]ven a minimal increase in mental demands or change in environment would likely cause [Plaintiff] to decompensate."  (Tr. 657.)  Notably, Hollis declined to explain her answer when asked.

---

[28] Plaintiff does not contend that she has had "[r]epeated episodes of decompensation, each of extended duration." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04(C)(1).

While Plaintiff appeared to experience significant stress regarding her financial situation and her relationship with her ex-partner, there is no evidence in the record that Plaintiff's mental impairments were so severe that even a minimal increase in mental demands or a change in her environment would cause her to decompensate.   In fact, Plaintiff's treatment providers, including Hollis, encouraged her to be more active and get out more.   And, as will be discussed in greater detail below, the ALJ was justified in discounting Hollis's credibility.

### b.  Highly Supportive Living Arrangement

Plaintiff asserts that the ALJ's conclusion that she was able to function outside of a highly supportive living arrangement is not supported by substantial evidence in the record and "mischaracterizes the facts in evidence."  (Pl.'s Mem. in Supp. at 26; *see* Pl.'s Reply at 5.)  Plaintiff contends that she lives in a "highly supportive living arrangement" because her children do the cooking, she receives rides from others, and others assist her with paying the bills and "most household tasks."  (Pl.'s Mem. in Supp. at 26; *see also* Pl.'s Mem. in Supp. at 34; Pl.'s Reply at 5.)

The parties have not provided, and the Court has been unable to locate, a precise definition of what constitutes a "highly supportive living arrangement."  The regulations indicate that hospitalization and placement in a halfway house or board-and-care facility may constitute such an arrangement.   *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(4), (F); *see also Wilson v. Astrue*, No. 10-cv-418 (MJD/AJB), 2011 WL 916357, at *14 (D. Minn. Feb. 11, 2011) ("Her present setting is a highly supportive living arrangement because it is a group-living setting.  Plaintiff's living needs are met by

the government and managed by a social worker, and Plaintiff receives help from a nurse on a weekly basis."), *adopting report and recommendation*, 2011 WL 938304 (D. Minn. Mar. 16, 2011); *cf. Miller v. Comm'r of Soc. Security*, No. 3:12 CV 3064, 2014 WL 916945, at *11-12 (N.D. Ohio Mar. 10, 2014) (concluding group home did not constitute a highly supportive living arrangement because "[a]lthough Plaintiff's meals are prepared and his medication is distributed by an employee of the group home, he is otherwise without supervision[,] . . . may come and go as he pleases (with the exception of an evening curfew), and . . . engages in many off-site activities, including work, going to restaurants, the fitness center, movies, and the park"). Such an arrangement can also be found in one's own home. *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(4), (F).

Outside of Plaintiff's hospitalization, there is no evidence in the record that Plaintiff ever resided in a highly supportive living arrangement or that any of her treatment providers recommended that she needed such an environment. Plaintiff lives in her own home with four school-aged children. Plaintiff receives help from her eldest daughter and her children's father in transporting the children to their activities, getting things for the children, and paying the bills. At one point, Plaintiff reported that she goes grocery shopping once per month but later stated that she depends on her daughters to do the shopping. Plaintiff testified that her children help with household chores (as children are often expected to do), but also reported doing laundry and cleaning. As the ALJ pointed out, "on an average day, . . . [Plaintiff] wakes up early in the morning and makes sure that her four children make it to school on time, ensures that they complete their homework, cleans the house, and manages to get herself to her [GED] prep classes each

day." (Tr. 19-20.) There is substantial evidence in the record to support the ALJ's conclusion that Plaintiff did not live in a highly supportive living arrangement. *See Lilly v. Astrue*, No. 5:07CV77, 2008 WL 4371499, at *23 (N.D. W.Va. Sept. 22, 2008) (evidence showed claimant possessed ability to function outside of highly supportive living arrangement where claimant lived at home with children and husband, performed housework, took care of children, and left house to shop and evaluators found claimant only moderately limited in her mental functioning).

### c. Listing 12.06(C) Criteria

With the exception of a contention that she is "house-bound," (Pl.'s Mem. in Supp. at 34), Plaintiff makes no mention of the C criteria for listing 12.06, "complete inability to function independently outside the area of one's home," 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.06(C). Although Plaintiff is at times accompanied by someone else, the record shows that she uses public transportation to attend her medical appointments and GED classes. None of Plaintiff's treatment providers described her anxiety as inhibiting her from functioning independently outside of her home. There is substantial evidence in the record to support the ALJ's conclusion that Plaintiff did not meet the C criteria for listing 12.06.

In sum, the Court concludes that there is substantial evidence in the record as a whole to support the ALJ's determination that Plaintiff did not meet or equal a listed impairment.

## B.  Credibility Determinations

Plaintiff next contends that the ALJ's credibility determinations are flawed, specifically his decision to discount the opinion of Hollis, Plaintiff's treating psychologist, and his findings with respect to Plaintiff and her daughter as to the effect of Plaintiff's severe impairments.  (Pl.'s Mem. in Supp. at 24-31; Pl.'s Reply at 5-9.)

### 1.  Hollis

"In deciding whether a claimant is disabled, the ALJ considers medical opinions along with the rest of the relevant evidence in the record."  *Heino v. Astrue*, 578 F.3d 873, 879 (8th Cir. 2013) (quotations omitted).  "Generally, a treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.  However, a treating physician's opinion does not automatically control, since the record must be evaluated as a whole."  *Renstrom v. Astrue*, 680 F.3d 1057, 1064 (8th Cir. 2012) (quotations and citations omitted).  "It is well established that an ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence contained within the record."  *Heino*, 578 F.3d at 879 (quotation omitted).

Hollis is a licensed psychologist and an acceptable medical source.  20 C.F.R. § 416.913(a)(2).  In October 2011, Hollis completed a mental health impairment questionnaire in which she said that Plaintiff "could not work, had severe and debilitating mental health impairments, would easily decompensate with even minimal increases in stress, and would miss work at least three days . . . per month."  (Tr. 19.)  The ALJ

concluded Hollis's opinion was not credible because (1) it conflicted with Hollis's response on a county form two weeks later; (2) there was no evidence in the record indicating that Plaintiff "was unable to function outside of a supportive living environment or that she ever needed such an environment"; (3) Hollis's conclusion about the presence of "severe and profound mental health limitations in almost every functional domain" was not matched by Plaintiff's "generally conservative treatment record"; (4) Plaintiff's own statements and testimony suggested that she had greater functioning; and (5) other medical evidence indicated Plaintiff had greater functioning.  (Tr. 18, 19.)

### a.  Inconsistent Forms

The first reason the ALJ gave for discounting Hollis's opinion is that she gave "contradictory" statements on two forms completed within two weeks of one another. (Tr. 19.)  The ALJ stated that Hollis's first statement "that even a minimal increase in mental demands would cause [Plaintiff] to decompensate" was inconsistent with a second statement that Hollis "did not think that it was likely [Plaintiff] would have future mental health episodes that would require inpatient or residential treatment."  (Tr. 19.)  When a medical source's opinion is internally inconsistent, it is entitled to less deference than it would be without those inconsistencies.  *Wagner*, 499 F.3d at 850.

Plaintiff contends that the two forms were completed for different purposes and the ALJ's "rationale is based on an erroneous reading of the two forms."  (Pl.'s Mem. in Supp. at 25.)  Plaintiff's argument appears to be that the reason that Hollis did not check "yes" when asked if Plaintiff was likely to need in-patient or residential treatment in the future unless services were provided was because Plaintiff was already receiving

psychotherapy and medication management. (*Id.*) The Commissioner responds that "[t]he ALJ's point in all this was that Plaintiff did not decompensate when confronted with minimal increases in mental demands." (Comm'r's Mem. in Supp. at 12.)

Notably, each form was largely in checklist format, which limits the evidentiary value of the items being compared. *See Wildman*, 596 F.3d at 964 ("The checklist format, generality, and incompleteness of the assessments limit the assessments' evidentiary value." (quotation omitted)). But, even assuming the apparent inconsistency is considered resolved under Plaintiff's theory and the ALJ erred with respect to this justification, the ALJ gave multiple, valid reasons for discounting Hollis's opinion, which, as discussed below, demonstrate that Hollis's opinion was inconsistent with the record as a whole.

### b.  Highly Supportive Living Arrangement

As previously discussed in section VI(A)(2)(b), there is substantial evidence in the record to support the ALJ's conclusion that Plaintiff did not live in a highly supportive living arrangement, and the ALJ did not err discounting Hollis's credibility on this basis.

### c.  Conservative Treatment History

Plaintiff argues that the ALJ's characterization of her treatment history as "conservative" was not correct and therefore it was improper to discount Hollis's opinion on this basis. (Pl.'s Mem. in Supp. at 26; *see* Pl.'s Mem. in Supp. at 18-19.) Plaintiff asserts that there is no basis to conclude her treatment was conservative given her ongoing psychiatric care and psychotherapy, multiple medications, hospitalization, and participation in a partial hospitalization program. (*Id.* at 18.) The Commissioner appears

to concede that Plaintiff's treatment was not conservative.  (Comm'r's Mem. in Supp. at 15.)  But even if Plaintiff's treatment was not conservative, the Commissioner argues that the salient fact is the ALJ's conclusion that the "'treatment record does not appear consistent with someone that has almost no useful functional capacity as [Hollis] suggested.'"  (Comm'r's Mem. in Supp. at 16 (quoting Tr. 19).)  This Court agrees.

### d.  Plaintiff's Testimony

Plaintiff next challenges the discounting of Hollis's opinion based on Plaintiff own testimony.  (Pl.'s Mem. in Supp. at 26.)  The ALJ stated that Plaintiff's "statements and testimony . . . showed that she retained a considerable amount of adaptive functioning that calls into question whether she truly has 'poor or none' functioning in most functional domains" as determined by Hollis.  (Tr. 19.)  The regulations describe "adaptive activities" as activities "such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, carrying appropriately for your grooming and hygiene, using telephones and directories, and using a post office."  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(1).  The record shows that Plaintiff did a majority of these activities.  As previously discussed, Plaintiff rented a home, cared for the four children still living with her, cleaned, occasionally shopped, used public transportation, and kept in touch with family by telephone.  Plaintiff was also frequently observed to be neat and appropriately groomed.  These activities cut against Hollis's opinion that Plaintiff had little to no ability to perform work-related activities, such as carrying out simple instructions, performing routine tasks at an adequate pace, maintaining socially appropriate behavior, and following a schedule.  Thus, the ALJ

properly concluded that Plaintiff's own reports of her activities showed she had greater functioning than Hollis opined.

Plaintiff incorporates within this argument her challenge to the ALJ's finding that Plaintiff's mental health was relatively stable with the exception of periods of situational stress. (Pl.'s Mem. in Supp. at 26, 20-22.)  In support of her argument, Plaintiff relies primarily on GAF scores. (*Id.* at 21-22.)  The link Plaintiff is attempting to draw between the ALJ's determination of Hollis's credibility and his findings of relative stability is not immediately apparent to this Court.  Plaintiff appears to have performed these activities throughout the time period at issue.  Moreover, as will be discussed in greater detail in section VI(B)(2)(c), there are several occasions in the record where a change in Plaintiff's condition coincided with situational stress.

With respect to GAF scores, "the Commissioner has declined to endorse the GAF scale for use in the Social Security and SSI disability programs." *Halverson*, 600 F.3d at 930-31 (quotation omitted); *see also Jones v. Astrue*, 619 F.3d 963, 975 (8th Cir. 2010) (noting Commissioner's position that GAF scores do not have a direct correlation to the severity requirements for mental disorders).  Nevertheless, "the GAF scores may still be used to assist the ALJ in assessing the level of a claimant's functioning." *Halverson*, 600 F.3d at 931.  But, as with other evidence, "[t]he ALJ is permitted to give less weight to GAF scores if they are inconsistent with medical records as a whole." *Mortensen v. Astrue*, No. 10-cv-4976 (JRT/JJG), 2012 WL 811510, at *5 (D. Minn. Mar. 12, 2012); *accord Jones*, 619 F.3d at 974 ("an ALJ may afford greater weight to medical evidence

and testimony than to GAF scores when the evidence requires it" (internal quotation omitted)).

There are 18 GAF scores in the record. Of these scores, one appears to be a "repeat" of a prior score placed on a separate form and four appear to be carried over by the treatment provider in subsequent appointment notes after the initial assessment. In any event, Plaintiff's scores were generally in the low to mid 40s with a handful of scores in the 50s and 60s. A history of GAF scores at or below 50 demonstrates that the person has "serious symptoms or serious impairment in social, occupational, or school functioning." *Halverson*, 600 F.3d at 931 (citing *Pate-Fires v. Astrue*, 564 F.3d 935, 944 (8th Cir. 2009)); *accord* Diagnostic and Statistical Manual of Mental Disorder 34 (American Psychological Association 4th ed. text revision 2000) ("DSM-IV-TR"). Such scores, however, do not mandate a finding of disability. *See Mortensen*, 2012 WL 811510, at *4 ("*Pate-Fires* did not hold that a history of GAF scores below 50 conclusively demonstrates that the claimant is disabled.").

The ALJ discussed some (including two scores in the low 40s) but not all of Plaintiff's GAF scores—nor was he required to do so. *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) ("[A]n ALJ is not required to discuss every piece of evidence submitted. . . [and the] failure to cite specific evidence does not indicate that such evidence was not considered." (quotation and citation omitted)). Ultimately, the ALJ concluded that Plaintiff was moderately impaired in her social functioning and ability to maintain concentration, persistence, or pace and that she was capable of performing simple routine and repetitive tasks in a low-stress environment. The ALJ's conclusion

that Plaintiff functioned above a level of "serious impairment in social, occupational, or school functioning," DSM-IV-TR at 34, is consistent with the ALJ's findings that Plaintiff had greater functioning based on her testimony and activities and the observations of treatment providers that she had normal thought processes, was able to concentrate, had appropriate eye contact and speech, and was otherwise socially appropriate. That the ALJ chose to focus on Plaintiff's higher GAF scores is not unreasonable in view of the record as a whole. *See Mortensen*, 2012 WL 811510, at *5. The ALJ's characterization of Plaintiff as stable when she was not experiencing situational stressors is not outside the available zone of choice. *See Heino*, 578 F.3d at 879.

### e. Other Medical Opinion Evidence

Lastly, Plaintiff asserts that the ALJ improperly discounted Hollis's opinion based on "other credible medical opinion evidence." (Tr. 19.) Plaintiff asserts that the records of Lietzau, Wolfe, and Dr. Wood support Hollis's opinion and the ALJ did not discuss their opinions and that the state agency consultants, namely, Drs. Shields and Nelsen, did not have the benefit of additional mental health records in rendering their opinions. (Pl.'s Mem. in Supp. at 27-29; *see* Pl.'s Reply at 8-9.)

First, the fact that the ALJ did not mention Lietzau, Wolfe, and Dr. Wood in his opinion does not mean that he did not consider their treatment notes. *Wildman v*, 596 F.3d at 966. Second, the ALJ specifically cited to records from each of these providers, indicating that this evidence was considered. (Tr. 17 (citing 7F (Lietzau), 22F/10 (Wolfe), 20F (Dr. Wood).) And although the ALJ did not name Dr. Wood or specifically

cite Dr. Wood's treatment notes in his decision, he did discuss Dr. Wood's observations of Plaintiff while she was participating in the partial hospitalization program. Third, the records of these treatment providers do not, overall, support Hollis's conclusions regarding Plaintiff's functioning. Some of Lietzau's records support Hollis, but the majority of them support the ALJ's residual-functional-capacity determination based on appropriate grooming, speech, and thought processes and only mild or moderate impairments in Plaintiff's memory. Similarly, aspects of Wolfe's treatment notes support both Hollis's conclusion and the ALJ's residual-functional-capacity determination. The same is true for Dr. Wood. While Dr. Wood assessed Plaintiff with a GAF score of 45, Dr. Wood's notes show that Plaintiff was doing better and stabilizing.

As for Drs. Shields and Nelsen, the state agency consultants, "the opinions of nonexamining sources are generally given less weight than those of examining sources." *Wildman*, 596 F.3d at 967 (quotation omitted). Further, "[a]s a general matter, the report of a consulting physician who examined a claimant once does not constitute substantial evidence upon the record as a whole, especially when contradicted by the evaluation of the claimant's treating physician." *Wagner v. Astrue*, 499 F.3d 842, 849 (8th Cir. 2007) (quotation omitted). "[W]hen evaluating a nonexamining source's opinion, the ALJ evaluates the degree to which these opinions consider all of the pertinent evidence in the claim, including opinions of treating and other examining sources." *Wildman*, 596 F.3d at 967 (quotation omitted). "[T]he opinion of a nonexamining consulting physician is afforded less weight if the consulting physician did not have access to relevant medical records, including relevant medical records made after the date of evaluation." *McCoy v.*

*Astrue*, 648 F.3d 605, 616 (8th Cir. 2011). "When one-time consultants dispute a treating physician's opinion, the ALJ must resolve the conflict between those opinions." *Wagner*, 499 F.3d at 849 (quotation omitted).

Plaintiff's argument implies that the world of medical evidence was limited to the findings of Hollis, Lietzau, Wolfe, Dr. Wood, and consultants Drs. Shields and Nelsen. That is simply not the case. As discussed above, Plaintiff went to the Bethesda Clinic approximately every two weeks. She was seen by several providers and, while these visits were not often prompted by mental-health concerns, these providers frequently discussed such concerns with Plaintiff and made notes relevant to Plaintiff's ability to function. The ALJ specifically cited to notes from these providers in his discussion of Plaintiff's residual functional capacity. Moreover, the ALJ also cited the notes of Dr. Mohan, another psychiatrist.

The Commissioner appears to concede that Drs. Shields and Nelsen did not have access to certain medical records. (Comm'r's Mem. in Supp. at 14 n.4.) Drs. Shields and Nelsen rendered their opinions in February and September 2010, respectively. Thus, the records from late 2010 through the beginning of 2012, including Plaintiff's suicide attempt in early 2011, were not available to them. Nonetheless, "[t]he fact that a state agency medical consultant did not have access to all of the records does not prevent the ALJ from assigning significant weight to the consultant's assessment if the ALJ conducted an independent review of the evidence, which included notes the consultant had not considered." *Vue v. Colvin*, No. 13-cv-357 (ADM/FLN), 2014 WL 754873, at *9 (D. Minn. Feb. 26, 2014) (quotation omitted); *accord Thacker v. Astrue*, No. 3:11CV246-

GCM-DSC, 2011 WL 7154218, at *6 (W.D.N.C. Nov. 28, 2011).   The ALJ cited numerous records made after the opinions of Drs. Shields and Nelsen were rendered as well as discussed Plaintiff's suicide and the treatment that followed.   The ALJ also had the benefit of Plaintiff's testimony at the hearing.   Plaintiff argues that, in addition to Hollis, numerous records including those of Lietzau, Wolfe, and Dr. Wood, were added following the rendering of Drs. Shields and Nelsen's opinions.  (Pl.'s Mem. in Supp. at 29.)   But, as previously discussed, many of these records support the ALJ's residual-functional-capacity determination and not a finding of disability.   Therefore, the ALJ did not err in finding credible the opinions of Drs. Shields and Nelsen over Hollis given that the ALJ had the benefit of the entire record and there is substantial evidence in the record supporting the conclusions reached therein following the rendering of those opinions.

Based on the foregoing, the ALJ did not err in determining Hollis was not credible and assigning her opinion little evidentiary weight.

## 2.  Plaintiff

Plaintiff next asserts that the ALJ erred when assessing her credibility.  Plaintiff refers to her previous arguments regarding the ALJ's findings that her treatment was "conservative," other credible medical evidence did not support her allegations, and her statements and testimony indicate that she is able to engage in a wide range of activities and therefore retained significant adaptive functionality.  (Pl.'s Mem. in Supp. at 29.) Plaintiff also challenges the ALJ's finding that she was noncompliant with her medication and asserts that the ALJ minimized her isolation and anger.  (*Id.* at 29, 30; *see also id.* at 22.)   The Court also considers Plaintiff's challenge to "[t]he ALJ's

determination that [Plaintiff] did not attempt suicide" in the category of challenged credibility determinations. (*Id.* at 19-20.)

In analyzing Plaintiff's subjective complaints, "the ALJ must consider [her] prior work history; daily activities; duration, frequency, and intensity of pain; dosage, effectiveness[,] and side effects of medication; precipitating and aggravating factors; and functional restrictions." *Halverson*, 600 F.3d at 931 (quotation omitted). The ALJ need not specifically discuss each factor. *Wildman*, 596 F.3d at 968.

"Another factor to be considered is the absence of objective medical evidence to support the complaints, although the ALJ may not discount a claimant's subject complaints solely because they are unsupported by objective medical evidence." *Halverson*, 600 F.3d at 931-32. "ALJ's may discount claimants' complaints if there are inconsistencies in the record as a whole, and [courts] will defer to an ALJ's credibility finding as long as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so." *Wildman*, 596 F.3d at 968 (quotation omitted).

### a.  Previously Discussed Arguments

With respect to the "conservative" nature of Plaintiff's treatment, this Court earlier noted that the Commissioner appears to concede that Plaintiff's treatment was, in fact, not "conservative." *See supra* section VI(B)(1)(c). Notwithstanding the ALJ's characterization of Plaintiff's treatment, the key conclusion drawn by the ALJ is that Plaintiff's treatment record was inconsistent with the severity of Plaintiff's allegations. Likewise, for the reasons stated above, Plaintiff's statements and activities were inconsistent with her allegations of a disabling impairment and there is substantial

evidence in the record to support the ALJ's conclusion that Plaintiff's impairments were not as limiting as she alleged.

### b.  Noncompliance with Treatment

Noncompliance with a doctor's instructions to take medications is a valid reason for discrediting subjective complaints.  *Wildman*, 596 F.3d at 969.  The ALJ noted that Plaintiff's "treatment records generally suggested that when [Plaintiff] was compliant with her medication regime and was not experiencing situation stress, she retained a considerable amount of functional capacity."  (Tr. 19.)  Plaintiff contends that "[t]here is no evidence in the record to support an implication of intentional noncompliance" and, due to her poor memory, she often forgot to take her medications.  (Pl.'s Mem. in Supp. at 22.)  The Commissioner responds that "[t]he ALJ did not say she was internationally [sic] noncompliant, he simply stated that she did well when she took her medications." (Comm'r's Mem. in Supp. at 19.)

The record contains several instances in which Plaintiff reports and treatment providers document Plaintiff forgetting to take her medication.  Nevertheless, treatment providers also observed Plaintiff to have normal or slightly impaired memory.  At times, Plaintiff reported self-modifying her medications because she experienced side effects and once stated that she did not take her medications because she was busy.  Plaintiff's treatment providers continuously emphasized to Plaintiff the importance of taking her medications.  And, when taken, Plaintiff did report some improvement from her medications.  "If an impairment can be controlled by treatment or medication, it cannot be considered disabling."  *Brown*, 3904 F.3d at 540 (quotation omitted).  Based on the

112

conflicting evidence in the record, the Court determines that the ALJ did not err in considering the effects of medication compliance when evaluating Plaintiff's credibility.

### c.  Minimization of Anger and Isolation

Plaintiff contends that the ALJ "attempted to minimize [Plaintiff's] description of her anger and isolation" and "'play[ed] doctor' impermissibly and substitute[ed] his opinions for those of the treating mental health professionals."  (Pl.'s Mem. in Supp. at 30.)  Plaintiff cites the ALJ's comments that "we all have those moments where we get irritated if somebody picks on one of our kids"; "I think a lot of reasonable people could start an argument" in that situation; and "I guess we all get into arguments when we don't like what we hear sometimes" when talking with Plaintiff about how her irritability limited her ability to attend her son's athletic events.  (Pl.'s Mem. in Supp. at 30; Tr. 55.) Plaintiff also cites the decision of *Davies v. Astrue*, No. 11-3006-CV-S-NKL-SSA, 2011 WL 4349366 (W.D. Mo. Sept. 15, 2011), in support of her argument.

The Commissioner responds that the ALJ was simply asking Plaintiff for an example of something that irritated her and followed Plaintiff's response with "a commonsense observation."  (Comm'r's Mem. in Supp. at 18.)  "In any event . . . ," the Commissioner continues, "the ALJ's duty was to determine whether Plaintiff could work, not whether she could attend her son's sports games," and the ALJ properly "accounted for her difficulties with social functioning by limiting her to jobs requiring only occasional interaction with the public and coworkers."  (*Id.* at 18-19.)

In his decision, the ALJ wrote:

> [Plaintiff] also alleged that she became easily irritated and
> would frequently snap at people with the slightest
> provocation.  She even testified that she could not do things
> like attend her children's sporting events for fear of
> embarrassing her children if she got into an argument with
> others.  At the hearing, the undersigned asked [Plaintiff] for
> examples of things that irritated her, but the examples she
> provided were examples of things that would irritate most
> people.

(Tr. 20.)  The Court views the ALJ's comments as an effort to obtain information in a
conversational manner.  Further, as previously discussed in the context of Plaintiff's
social functioning, the ALJ had ample evidence in the record from multiple treatment
providers that Plaintiff was generally observed to be in no distress, comfortable, and
pleasant.   And, as the Commissioner correctly points out, the ALJ accounted for
Plaintiff's moderate limitations in social functioning in determining her residual
functional capacity.

In *Davies*, the ALJ briefly referenced the depression diagnosis made by the
claimant's treating physician and findings of moderate to marked limitations and then
"detail[ed] rather extensively the traumas which [the claimant] has suffered in her life,
. . . and conclud[ed] that 'the claimant's treating doctors gave her a diagnosis of major
depression on little more than her subjective complaints.'"  2011 WL 4349366, at *3.

> The ALJ then state[d] that depressed feelings are common for
> people who have suffered adverse events, opine[d] that
> "depression is a descriptive term which describes a mood as
> well as a mental illness," and then conclude[d] that the
> treating doctors did not provide "a clear explanation of how
> the claimant's alleged mood problems were due to mental
> pathology rather than a normal emotional reaction to the
> difficulties in her life."

*Id.*  The court concluded that the ALJ "encroach[ed] into the role normally occupied by an evaluating physician. . . . [as t]he determination of the causes and typology involved in a diagnosis of clinical depression is not one which the ALJ is qualified to make without reference to the objective medical evidence and reports."  *Id.*  The court stated that the ALJ had neither "pointed to [a] place in the medical record which would provide substantial evidence to support his assumptions concerning the nature of depression or the impact of life events on mental illness," nor provided "any explanation of how Davies' symptoms . . . might indicate a 'normal emotional reaction' rather than a 'disabling mental illness.'"  *Id.*

Here, there are numerous instances in the record where Plaintiff herself and her treatment providers note the aggravating effect situational stressors have on her.  Plaintiff herself stated that her suicide attempt was the culmination of stress brought on by her relationships with her ex-partner and her mother.  Treatment providers repeatedly noted that Plaintiff was experiencing financial stress.  In particular, Hollis encouraged Plaintiff to limit the amount of stress in her life.  Given the substantial evidence in the record as a whole that situational stressors aggravated Plaintiff's symptoms, the ALJ did not err in discounting Plaintiff's credibility concerning the severity of her impairments and attributing their aggravation to situational sources rather than mental illness.  *Davies* is inapposite.

### d.  Other Motivations

The ALJ can also take into account "statements suggest[ing] alternative motives on [the claimant's] part" when assessing credibility.  *Halverson*, 600 F.3d at 932.  The

ALJ found significant statements in the record that Plaintiff was not looking for work and she could not work because "she had children and the children's father was not always around to help."  (Tr. 20.)  While the Court does not doubt that Plaintiff is juggling many responsibilities, the ALJ properly considered whether Plaintiff had alternative motives when assessing her credibility.

### e.  Suicide

In addition, Plaintiff contends that the ALJ determined that she did not attempt suicide.  (Pl.'s Mem. in Supp. at 19-20; *see* Pl.'s Reply at 2.)  In discussing whether Plaintiff experienced a period of decompensation as defined by the listings, the ALJ stated:

> On February 27, 2011, [Plaintiff] overdosed on Xanax and was put on a psychiatric hold until March 2, 2011.  *Treatment notes* during that holding period indicated that [Plaintiff] did not have a true desire to end her life and that she was reacting to a stressful family situation . . . .

(Tr. 15 (emphasis added).)  First, the ALJ is simply indicating what the treatment notes state.  Later in his decision, he specifically describes this event as Plaintiff "attempted to commit suicide."  (Tr. 17.)  Second, while Plaintiff may take issue with the phrase "did not have a true desire to end her life," Dr. Wood described this event as a "parasuicide attempt" in her treatment notes.  As the Commissioner correctly points out, parasuicide is defined as a "[n]on-fatal self poisoning or self-injury, or attempted suicide. . . .  As a rule, the intention is not to commit suicide but to sound a cry for help to resolve an acute domestic, social or personal upset."  *Black's Medical Dictionary* 236 (41st ed. 2005).  Third, Plaintiff does not contend that if the ALJ had "credited" her suicide attempt, she

would have met or equaled a listing; Plaintiff just describes the event as demonstrating "significant decompensation."  (Pl.'s Reply at 2.)  The Court does not in any way mean to diminish the seriousness of this event; nor does the Court perceive that the ALJ did so. The ALJ stated, in a matter-of-fact manner, the information contained in Plaintiff's treatment records and concluded that the attempted suicide did not meet the listing's definition of decompensation.  Plaintiff cannot fault the ALJ for accurately conveying the information contained in her medical records.

### 3.  Plaintiff's Daughter

Lastly, Plaintiff contends that, although the ALJ found her daughter's statements "generally credible," the ALJ "grossly mischaracterized" them and selectively incorporated them.  (Pl.'s Mem. in Supp. at 30-31; Pl.'s Reply at 7-8.)  In her reply memorandum, Plaintiff states that "[t]he issue is not what sort of [residual functional capacity] . . . Rivera's statements support, it is that the ALJ found . . . Rivera's statements credible *in whole* while failing to give any credence to her particular statements noting functional difficulties."  (Pl.'s Reply at 8.)  The Commissioner responds by pointing out ways in which Rivera's statements are consistent with the ALJ's residual-functional-capacity determination and states, "Put simply, Plaintiff has not shown how . . . Rivera's function report justified a more restrictive [residual functional capacity]."  (Comm'r's Mem. in Supp. at 21.)

In addition to considering evidence related to a claimant's subjective complaints and daily activities and the reports of treating and examining physicians, the ALJ is required to consider observations of third parties.  *McCoy*, 648 F.3d at 614 (8th Cir.

2011).  "The regulations also provide that the ALJ will 'carefully consider any other information you may submit about your symptoms,' including statements 'other persons provide about your pain or other symptoms.'"  *Buckner v. Astrue*, 646 F.3d 549, 559 (8th Cir. 2011) (quoting 20 C.F.R. § 404.1529(c)(3)); *accord* 20 C.F.R.§ 416.929(c)(3) (same).  The regulations do not define "careful consideration" and the Eighth Circuit "has not always insisted that the ALJ explicitly explain its reasons for discrediting a third-party's statements about the claimant's condition."  *Buckner*, 646 F.3d at 559.

First, the Court does not agree with Plaintiff's assertion that the ALJ credited Rivera's statements wholesale; the ALJ described Rivera's statements as "generally credible."  (Tr. 20.)  Second, while the ALJ focused on those statements indicating greater functionality, the ALJ did not, as Plaintiff contends, completely disregard statements noting functional difficulties.  The ALJ specifically recognized that Plaintiff did not handle stress well—one of Rivera's statements that Plaintiff asserts the ALJ completely disregarded.  (*See* Pl.'s Mem. in Supp. at 31; Pl.'s Reply at 8.)  Moreover, to the extent that Rivera stated her mother had difficulty understanding and following instructions, Rivera also said that she "d[id not] know" Plaintiff's ability to follow written and spoken instructions.  (Tr. 174.)

In any event, the limitations Plaintiff identifies in Rivera's statements—inability to handle stress; limited ability to remember, complete tasks, and concentrate; and social-functioning difficulties—are all reflected in the ALJ's residual-functional-capacity determination.  The ALJ limited Plaintiff to simple, routine, and repetitive tasks in a low-stress environment that has only occasional changes in the work setting.  The ALJ clearly

118

considered Rivera's statements.  *Cf. Willcockson v. Astrue*, 540 F.3d 878, 880 (8th Cir. 2008) (court could not determine from the record whether ALJ overlooked statements of claimant's mother, daughter, and sister regarding claimant's condition, gave them some weight, or completely disregarded them).  Could the ALJ have listed each and every one of Rivera's statements he found to support his residual-functional-capacity determination?  Perhaps.  But, a line-by-line analysis of Rivera's statements, would not change the outcome of this case, and "an arguable deficiency in opinion-writing technique does not require [the court] to set aside an administrative finding when that deficiency ha[s] no bearing on the outcome."  *Buckner*, 646 F.3d at 559 (quotation omitted).

[Continued on next page.]

## VII. RECOMMENDATION

Based upon the record, memoranda, and the proceedings herein, and for the reasons stated above, **IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Summary Judgment (Docket No. 9) be **DENIED** and Defendant's Motion for Summary Judgment (Docket No. 15) be **GRANTED**.

Dated: July___31___, 2014                              _____*s/ Tony N. Leung*_____
                                                       Tony N. Leung
                                                       United States Magistrate Judge
                                                       for the District of Minnesota

                                                       *Perry v. Colvin*
                                                       Case No. 13-cv-1185 (JNE/TNL)

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and by serving upon all parties written objections that specifically identify the portions of the Report to which objections are made and the basis of each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals.  Written objections must be filed with the Court before **August 15, 2014**.

120